1                UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF NEW YORK

3

4

5  - - - - - - - - - - - - - X

DETROY LIVINGSTON,             08-CV-6576(G)

6          Plaintiff

vs.

7                      Rochester, New York

JAMES ESGROW, ET AL.,       October 22, 2013

8         Defendant.       8:30 a.m.

- - - - - - - - - - - - - X

9

10

11               TRANSCRIPT OF PROCEEDINGS

       BEFORE THE HONORABLE FRANK P. GERACI, JR.

12           UNITED STATES DISTRICT JUDGE

13

14            DETROY LIVINGSTON, PRO SE

15

16         NYS ATTORNEY GENERAL OFFICE

         BY: J. RICHARD BENITEZ, ESQ.

17         Assistant Attorney General

         144 Exchange Boulevard

18         Rochester, New York 14614

         Appearing on behalf of the Defendants

19

20

21

22

23  COURT REPORTER:    Christi A. Macri, FAPR, RMR, CRR, CRI

                Kenneth B. Keating Federal Building

24               100 State Street, Room 4240

                Rochester, New York 14614

25

1                          <u>I N D E X</u>

2
Renee Gates
3       Direct examination by Mr. Livingston      Page 19
        Cross-examination by Mr. Benitez          Page 44
4       Redirect examination by Mr. Livingston    Page 52
        Recross-examination by Mr. Benitez        Page 77
5       Redirect examination by Mr. Livingston    Page 78

6
William Bills
7       Direct examination by Mr. Livingston      Page 81

8

9

10

11

12

13  <u>EXHIBIT          RECEIVED</u>

14  Plaintiff Exhibit  4  28
    Plaintiff Exhibit 10  32
15  Plaintiff Exhibit 18  39
    Plaintiff Exhibit 9A  59
16  Plaintiff Exhibit 16  74

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

\*          \*          \*

(**WHEREUPON**, the jury is not present).

**THE COURT:** Good morning.

**MR. BENITEZ:** Good morning.

**MR. LIVINGSTON:** Good morning.

**THE COURT:** Before we begin, Mr. Livingston did make a motion to preclude proposed Exhibit 404, which is a Third Department decision regarding his Article 78 proceeding in which they denied his application.

And more specifically, ruled that examining the petition that they find unavailing his arguments that he was deprived of adequate employee assistance or denied the right to present witness testimony.

The reason that becomes important is the case provided by Mr. Benitez, *Ford vs. Krusen*, K-R-U-S-E-N, the original decision was a decision by magistrate judge on a Report and Recommendation and that was ultimately affirmed by the District Court at 2009 U.S. District Lexis 29044.

The reason why that's important is although there's no claimed preclusion, which means that Mr. Livingston had a right to bring a 1983 claim, per law there is an issue preclusion, specifically, regarding the due process claims involving not receiving adequate employee assistance and being denied the right to present witness testimony.

1            So it appears at this point that though

2    Mr. Livingston could present the evidence regarding that, that

3    ultimately those charges would have to be dismissed on a

4    Rule 50 motion.

08:51:22AM 5            Is that your take on it, Mr. Benitez?

6            **MR. BENITEZ:** Yes, it is, Judge.  That was my

7    intention to make a motion for Rule 50 motion on that.

8    Likewise, even if it went to the jury, those are two critical

9    elements that he would not be able to prove because he's

08:51:41AM 10   collaterally estopped by the state decision.

11            So I wholeheartedly agree with the Court's decision

12   on that.

13            **THE COURT:** Mr. Livingston, do you understand what I

14   just said?  I know it's complicated, but do you understand it?

08:51:56AM 15            **MR. LIVINGSTON:**  Not really, I don't really

16   understand.

17            **THE COURT:** You do or don't?

18            **MR. LIVINGSTON:**  No, I don't.

19            **THE COURT:** Let me explain a little better for you.

08:52:02AM 20   In your Article 78 petition that you filed in state court, the

21   Third Judicial Department made a decision denying your

22   Article 78.

23            Do you understand that?

24            **MR. LIVINGSTON:**  Right.

08:52:15AM 25            **THE COURT:** But the basis on which they denied it

1  indicated that they examined your remaining assertions that

2  you were deprived of adequate employee assistance and denied

3  the right to present witness testimony, which are the exact

4  claims you make in this case, all right?

08:52:36AM 5          You have a right to bring a 1983 action.  And if it

6  were on other grounds, you could possibly be successful.

7  However, based upon the decision here, we have to give full

8  faith and credit to state court decisions on the issues, it's

9  called "collateral estoppel."  So you're actually estopped

08:52:56AM 10 from being successful on those two issues because it's already

11 been decided by a state court.

12          Do you understand that?

13          **MR. LIVINGSTON:**  Yes.

14          **THE COURT:**  So you can present your evidence on

08:53:04AM 15 that, but ultimately at the end of the proof, there will be

16 what's called a "Rule 50 motion" to dismiss and from

17 everything I've seen, I would have to grant that.

18          So the question is:  Do you want to continue to

19 proceed or do you want to -- do you understand what I just

08:53:24AM 20 ruled?

21          **MR. LIVINGSTON:**  I want to ask a question about

22 that.

23          **THE COURT:** Sure.

24          **MR. LIVINGSTON:**  Did they waive that right to

08:53:33AM 25 challenge that because they didn't bring it up prior in the

1  defense.

2          **THE COURT:**  Well, quite frankly, it should have

3  been done much earlier in a summary judgment motion and it

4  would have been granted then.  So they didn't waive it by now

08:53:49AM 5  bringing it up at that point, but obviously that was the

6  proper time to do it, much earlier than the time of trial.

7          I don't know why it wasn't done, but that's where

8  we are.  That's the posture at this point.  You're right, it

9  should have been done a long time ago and it would have been

08:54:07AM 10  granted on that basis.

11          So I don't know what your intent is; your other

12  claim obviously still remains, but --

13          **MR. LIVINGSTON:**  So all right.  So basically that

14  those defendants would be --

08:54:29AM 15          **THE COURT:** Those claims would be dismissed and

16  those defendants would be dismissed, which I'm telling you

17  now, I don't see any way to get around that ultimately.

18          **MR. LIVINGSTON:**  All right, so I will let you make

19  your ruling and carry on.

08:54:45AM 20          **THE COURT:** Okay.  So you don't have any objection

21  to that at this point; is that right?  Based upon what I've

22  indicated to you?

23          **MR. LIVINGSTON:**  No, not at this point.

24          **THE COURT:** Okay.  Do you want to make a motion,

08:54:58AM 25  Mr. Benitez, then?

1          **MR. BENITEZ:** Yes, thank you, Judge.  Good morning,

2  Your Honor.  On behalf of the defendants Esgrow, Dubray and

3  Sergeant Harvey I respectfully request judgment as a matter of

4  law regarding his -- regarding the plaintiff's claim of a

08:55:42AM 5  violation of the due process clause of the

6  Fourteenth Amendment based on collateral estoppel issues that

7  were raised and fully adjudicated in state court in an

8  Article 78 proceeding.

9          Based on the Findings of Fact of the Court of the

08:56:01AM 10  Third Department, I respectfully request that the

11  Fourteenth Amendment due process violation claim in this

12  matter be dismissed and a judgment be granted in favor of the

13  three individuals Esgrow, Dubray and Harvey pursuant to

14  Rule 50, or in the alternative Rule 12(c).

08:56:24AM 15          **THE COURT:** Do you want to be heard at all,

16  Mr. Livingston?

17          **MR. LIVINGSTON:**  Say again.

18          **THE COURT:** Do you want to be heard at all on that

19  any further?

08:56:33AM 20          **MR. LIVINGSTON:**  Yes, I would like to say one other

21  thing.

22          **THE COURT:** Sure.

23          **MR. LIVINGSTON:**  Good morning.  After reading this

24  case law that he provided to me, basically that's what it

08:57:00AM 25  says, what he said.  But one thing I don't understand, right,

1  it says on page 6, it says under the Rooker-Feldman, Federal

2  District Court, as court of original jurisdiction, lack the

3  power to entertain claims which if substantiated would

4  effectively overrule or modify a state court decision.

08:57:32AM 5       A federal *habeas corpus* does this.  It overrules a

6  state decision.  Like if you bring a federal -- I think the

7  exception is 2254 or something, it will reverse a state court

8  decision.  So I don't understand how it can't be the same

9  thing on the Article 78.

08:57:58AM 10      **THE COURT:** Well, it's not a preclusion of the

11  claim.  It's a preclusion of this particular issue and those

12  are the main issues related to your claim here.

13       And Rooker-Feldman does not apply in your

14  particular case.  Based upon all the factors of

08:58:13AM 15  Rooker-Feldman, it would not be applicable here.

16       **MR. LIVINGSTON:**  Okay, I --

17       **THE COURT:** It's collateral estoppel that applies.

18       **MR. LIVINGSTON:**  Yup, I understand.

19       **THE COURT:** All right.  As the Court indicated, the

08:58:32AM 20  Third Department -- on this?  On this?

21       **MS. WALKER:** Approach.

22       (**WHEREUPON**, there was a discussion off the record.)

23       **THE COURT:** Regarding this matter, there's a motion

24  to dismiss based upon the fact that the claims under due

08:59:19AM 25  process had been previously handled through an Article 78

1   proceeding in New York State court, specifically, the Third

2   Judicial Department decided on June 26th, 2008, denying

3   Mr. Livingston's application for relief under Article 78 and

4   specifically indicating that it had examined the petitioner's

08:59:43AM 5   assertions that he was deprived of adequate employee

6   assistance and denied the right to present witness testimony,

7   found those to be unavailing.

8          Based upon the principles enunciated in the *Ford*

9   *vs. Krusen* case, the Court finds there is an issue of

09:00:06AM 10   collateral estoppel here regarding issue preclusion regarding

11   those specific allegations that Mr. Livingston makes in this

12   particular case specifically alleged here that he was not

13   provided with adequate employee assistance and was denied the

14   right to present witness testimony by the defendants Esgrow,

09:00:27AM 15   Harvey and Dubray.

16          Based upon that ruling the Court does grant the

17   motion to dismiss the second cause of action regarding

18   violation of the defendants' due process rights and dismiss

19   the defendants Esgrow, Harvey and Dubray at this time.  So

09:00:45AM 20   they will be dismissed.

21          I will instruct the jury that certain individuals

22   that have been are no longer part of this case, they should

23   not speculate as to why that exists, okay?

24          **MR. LIVINGSTON:**  All right.

09:00:56AM 25          **THE COURT:**  In addition, my clerk Ms. Walker has

1   indicated, Mr. Livingston, you filed some exhibits yesterday?

2           **MR. LIVINGSTON:** Have they just arrived yesterday?

3           **THE COURT:** Apparently they did. Did they arrive by

4   mail?

09:01:11AM 5           **MS. WALKER:** They were indicated on the system they

6   were filed yesterday.

7           **THE COURT:** Apparently they were filed sometime

8   yesterday, some 200 pages of exhibits.  What are they?

9           **MR. LIVINGSTON:**  I sent them a while ago, I sent

09:01:24AM 10   them on the 16th.

11           **THE COURT:** That would have been last Wednesday.

12           **MR. LIVINGSTON:**  Yes, I believe, yes.  I put it in

13   the mail on that date.

14           **THE COURT:** What are -- would you summarize for me

09:01:40AM 15   what are the exhibits?  Do you have copies of those,

16   Mr. Benitez?

17           **MR. BENITEZ:**  No, I don't have copies of those, but

18   I did receive yesterday afternoon through the electronic

19   filing system -- not through the electronic filing system, I

09:01:51AM 20   apologize.

21           Through the mail I received what was

22   Mr. Livingston's *voir dire* information and his exhibit list

23   and some statements regarding damages and whatnot.  It's a 14

24   page document that I received through the mail yesterday

09:02:10AM 25   afternoon after returning to the office.

1          **THE COURT:** I don't have that either.  Can you print

2     that out for me?  Can you just summarize what the exhibits

3     are?

4          **MR. LIVINGSTON:**  Plaintiff application for leave to

09:02:26AM 5     appeal.

6          Plaintiff petition for writ of error coram nobis,

7     drug test methods and related issue.

8          Envelope mail from New York State Court of Appeals

9     on -- postmarked July 26, '06.  Letter from -- letter from New

09:02:47AM 10    York State Court of Appeals dated July 26th, 2006.

11         Envelope mailed from New York State Court of

12    Appeals postmarked August 24th and August 25th, '06, 2006,

13    certified by Judge Judith S. Kaye dated August 17, 2006.

14         Plaintiff inmate grievance with response from IGRC

09:03:24AM 15    to the superintendent CORC.

16         Investigation report of plaintiff inmate grievance.

17    Acknowledgment of receipt for legal mail.

18         Assistant form 35, copy of a tape recording of

19    disciplinary hearing.

09:03:49AM 20    Misbehavior report dated 4/26/07 with hearing

21    disposition.

22         Former Commissioner Brian Fisher's response

23    interrogatory.

24         Arrivals in Elmira Correctional Facility dated

09:04:09AM 25    August 2nd, 2006.

1          Elmira Correctional Facility inmate correspondent

2 program policies and procedures number 15.02.

3          Plaintiff -- plaintiff's appeal of superintendent

4 hearing.

09:04:30AM 5          DOCS directive number 14 -- 4015 forwarding of

6 inmate mail.

7          DOCS directive number 4421 privileged

8 correspondence.

9          New York State Court of Appeals rules of practice.

09:04:57AM 10          Plaintiff's letter to clerk of New York State Court

11 of Appeals dated August 21st, 2006.

12          Letter dated August 28th, 2006, from New York State

13 Court of Appeals Clerk's Office, defendant Keith Dubray

14 decision affirming disciplinary hearing disposition.

09:05:25AM 15          **THE COURT:** Those are the exhibits then?

16          **MR. LIVINGSTON:**  Yes.

17          **THE COURT:** Is there one that's large?  What's 200

18 pages?  Is there one -- is there a transcript in there?

19          **MR. LIVINGSTON:**  It's the -- it should be the

09:05:38AM 20 number two, the plaintiff petition for writ of error coram

21 nobis --

22          **THE COURT:** So --

23          **MR. LIVINGSTON:**  -- at the bottom of page 11 of

24 this, of my *voir dire* information.  The reason I didn't send

09:05:58AM 25 all these, what I just read on the list, because I stated the

1  plaintiff received this exhibits from the defendants during

2  discovery and certified exhibits was already been exchanged.

3  Thus, proponent is now required to appear in exhibit --

4  exhibit book for the other party, so he should have all of

09:06:23AM 5  these things right here because during discovery I gave it to

6  him or the other lawyer.

7           THE COURT: Okay.  Obviously, I don't have any of

8  this.  I'm going to have to get a printout.

9           THE CLERK: We're printing it.

09:06:42AM 10          THE COURT: I don't know why it was filed late

11  yesterday, but for some reason it was filed after our session

12  yesterday.

13          MR. LIVINGSTON:  I sent it like -- put it in the

14  prison mail on the 15th, the 16th.

09:06:59AM 15          THE COURT: Mr. Benitez, anything on that?

16  Obviously, anything related to the due process claims now

17  would not be admissible, but anything related to the access to

18  courts would be.  That sounds like there are a lot of

19  documents related to your first cause of action.

09:07:15AM 20          MR. BENITEZ:  The only thing related to those

21  exhibits specifically to the remaining claim, I do have a

22  couple objections to basically like two exhibits and that

23  would be Exhibit No. 6, I know the Court doesn't have it

24  before it.

09:07:33AM 25          THE COURT: What is it?

1      **MR. BENITEZ:**  He describes it as an envelope mailed

2  from the New York State Court of Appeals postmarked

3  August 24th, 2006, and August 25, 2006.

4      I don't know why one particular envelope would have

09:07:53AM 5  two different dates and I would like to offer proof on that,

6  but I would object to it being hearsay and being irrelevant to

7  the particular thing here, which is a July 26th, 2006,

8  envelope from the New York State Court of Appeals that's at

9  issue here.

09:08:14AM 10      He's stated that this postage mark -- postage stamp

11  dated -- envelope from the New York State Court of Appeals

12  dated July 26th, 2006, is the focal point of his claim for

13  access to courts.

14      I don't know.  So basically I'm asking for a offer

09:08:33AM 15  of proof as to why this would be, what's the purpose of this?

16  I'm not sure what it means.  But for me it's hearsay, my

17  objection would be hearsay and relevancy.

18      So that's the first exhibit that I have an

19  objection to, Judge.

09:08:49AM 20      Then the second would be to Exhibit No. 14, he

21  describes it as the former Commissioner Brian Fisher's

22  response to interrogatory.  I would object to it being hearsay

23  as well.  And under it being a -- even if it were a recorded

24  past recollection, it wouldn't be a document that would be

09:09:15AM 25  permitted to be entered as a document at this part of the

1   record anyway under rule, I think it's 805 -- it's

2   Rule 803(5).

3         Because that particular rule provides an exception

4   to the hearsay rule for past recollection recorded, but it

09:09:42AM 5   goes on to state if it's the adverse -- if the adverse party's

6   not proffering it, which would be us, or not offering it, that

7   it may not itself be received as an exhibit, it may not be

8   received as an exhibit.  It may be read in, I suppose, if

9   it's -- the Court finds it to be relevant, but I'm objecting

09:10:00AM 10   to it being a hearsay statement which under this rule, subject

11   to this rule may be read in if the Court felt it was relevant

12   I suppose.

13        **THE COURT:** Okay.  Well, I'll reserve on the

14   deposition regarding Commissioner Fischer.

09:10:22AM 15        Regarding the envelope from the Court of Appeals

16   from August '06, what's the relevance of that, Mr. Livingston?

17        **MR. LIVINGSTON:**  Well, that's the envelope that

18   Judge Judith Kaye's decision came in.  I wanted to show that

19   because the defendant is saying that the envelope's postmark

09:10:54AM 20   is not -- does not show that it was mailed that day.

21        And this envelope has the same -- same postmark

22   that was used and because -- because it wasn't received by the

23   post office on that same date that it was -- it was -- it was

24   stamped, they put another postmark on it, they own postmark,

09:11:23AM 25   just like in that case that he cited before when he -- I think

1    he was trying to argue that it wasn't a postmark.  He cited to

2    you in one of his arguments that, you know, it says something

3    like if the private owned machine stamp wasn't --

4    **THE COURT:** I understand the point you're making.

09:11:57AM 5    What I want to do is review that exhibit and I'll reserve on

6    that as well, okay?  Thank you.

7    Anything else?

8    **MR. BENITEZ:**  Just one more exhibit.  I'm not sure

9    what Exhibit 20 -- he states is New York State Court of

09:12:14AM10    Appeals rules of practice.  My objection to that would be

11    relevance because if the issue here is whether or not we

12    withheld this particular envelope on a given date, how this

13    applies to an envelope being withheld I really don't

14    understand that, so I'm objecting to relevance.

09:12:37AM15    But it's a publication.  It's self-authenticating.

16    So I understand it could go in that way, Judge, but if it's

17    irrelevant and it only protracts the matter longer and is

18    confusing, I object to its relevance.

19    **THE COURT:** Again, Mr. Livingston, what's the

09:12:56AM20    purpose of the rules of practice of the Court of Appeals?

21    **MR. LIVINGSTON:**  This evidence, this exhibit is to

22    show like the letter, the July 26th letter states that they

23    want me to submit additional documents.  The rules that I

24    selected in there shows what document they requested

09:13:27AM25    specifically, spells it out for you.  And it also shows that

1  what would happen if these documents wasn't submitted:

2  Dismissal.

3      **THE COURT:** Okay, I'll take a look at that as well,

4  I'll reserve on that.

09:13:45AM 5      Anything else?

6      **MR. BENITEZ:** Nothing further.

7      **THE COURT:** Anything else, Mr. Livingston?

8      **MR. LIVINGSTON:** Never mind. I had something else,

9  but since the defendants getting dismissed, I'll reserve that.

09:13:56AM 10      **THE COURT:** Okay. So at this time we can excuse the

11  defendants Esgrow, Dubray and Harvey. Thank you.

12      **THE DEFENDANT:** Thank you, Your Honor.

13      **THE COURT:** We're ready to proceed, Mr. Livingston?

14  How are you going to proceed at this point?

09:16:02AM 15      **MR. LIVINGSTON:** Defendant Gates.

16      **THE COURT:** Okay. All right. Ready to proceed,

17  bring the jury out.

18      **MR. LIVINGSTON:** Your Honor, since the exhibits not

19  available yet, because I would like to show certain things --

09:16:24AM 20      **THE COURT:** You have the exhibits there, right?

21      **MR. LIVINGSTON:** Yes, I have them.

22      **THE COURT:** Do you have a copy?

23      **MR. LIVINGSTON:** I have my copy.

24      **THE COURT:** Well, if you want to use an exhibit,

09:16:33AM 25  bring it up at the appropriate time, have the clerk mark it

1  for identification and show it to Mr. Benitez and then we'll

2  see whether or not it's admissible.  Okay?

3         **MR. LIVINGSTON:**  All right.

4         **THE COURT:** So we'll do them one by one.

09:17:31AM 5         (**WHEREUPON**, the jury is present).

6         **THE COURT:** Good morning, ladies and gentlemen.

7  Ready to proceed at this time.  Ladies and gentlemen, you will

8  note that certain defendants who have been are no longer part

9  of the case.  The cause of action is no longer part of the

09:18:29AM 10  case.  You shouldn't speculate as to the reasons for that, so

11  we'll have other matters and defendants to consider in this

12  matter.

13        Ready to proceed, Mr. Livingston, call your first

14  witness.

09:18:39AM 15         **MR. LIVINGSTON:**  Okay, I get --

16         **THE COURT:** You can stand right at the podium, sure.

17  Speak into the microphone so the reporter can hear everything,

18  okay?

19         **MR. LIVINGSTON:**  Okay, thank you.

09:18:53AM 20         **THE COURT:** Thank you.

21         **MR. LIVINGSTON:**  Yes, Your Honor, thanks.  I like

22  to first call defendant Gates.

23         **THE COURT:** Renee Gates.

24         **MR. LIVINGSTON:**  Renee Gates.

09:19:06AM 25         **PLAINTIFF'S WITNESS, RENEE GATES, SWORN**

1 <u>**DIRECT EXAMINATION**</u>

2         **THE COURT:** State your name and spell your first and

3 last name for the record.

4         **THE WITNESS:** Renee M. Gates.  R-E-N-E-E, M,

09:19:39AM 5 G-A-T-E-S.

6 **BY MR. LIVINGSTON:**

7 Q.   Okay.  Good morning.

8 A.   Good morning.

9 Q.   Can you tell me on July 26, what was your occupation?

09:19:56AM 10 A.   Senior mail and supply clerk at Elmira Correctional

11 Facility.

12         **THE COURT:** That was of 2006?

13         **MR. LIVINGSTON:**  Yes, '06.

14 **BY MR. LIVINGSTON:**

09:20:07AM 15 Q.   Can you tell us what that entailed?

16 A.   Overseeing two to three other state employees and taking

17 care of all incoming and outgoing facility mail, inmate mail.

18 Q.   So you handled the mail personally?

19 A.   Some of it.

09:20:35AM 20 Q.   Like legal mail?

21 A.   Some of it.

22 Q.   So legal mail, what would you do with legal mail when it

23 arrived?

24 A.   All right.  The mail would be delivered from the U.S.

09:20:55AM 25 Postal Service to us in the morning.  First thing that

1  happened was mail is separated into three different

2  categories: Legal mail, facility mail, and then inmate

3  personal mail such as family, magazines, et cetera, et cetera.

4  Q.   On August 17th, 2006, you was doing those things that you

09:21:29AM 5  just described?

6  A.   I may have been.  Like I said, there was two to three

7  others helping me.  I can't be specific if I was on the legal

8  mail that day or not.

9  Q.   Are you saying that you was doing those things like legal

09:21:50AM 10  mail, and what would you do when the legal mail come to your

11  station?

12  A.   All right, when the legal mail came after it was separated

13  and it was known to be legal mail, we have to immediately date

14  stamp it, and then it is divided out into blocks, separated

09:22:21AM 15  into galleries.

16        Then it is -- after it's date stamped, it's written

17  on a legal log, it's put -- after that's done, it is put in

18  with the legal paper sheet in a vinyl envelope, they were red

19  and green in color at the time, and then they went into a

09:22:55AM 20  canvas mail bag which then proceeded to have a specified lock

21  attached to it so that -- for delivery from our office to the

22  block, that nothing could be added or taken out, and then the

23  officer who was handling the mail in that block has a key and

24  at which time he opens it up.

09:23:30AM 25  Q.   This log, this logbook or log you speak about, that's the

1 one that the prisoners sign?

2 A.   Yes.  And there's also one -- there's a green one that has

3 some things that went out.

4 Q.   That's -- I'm talking about for the --

09:23:56AM 5 A.   For the coming in it's the sheet, yes.

6 Q.   Just the acknowledgment sheet?

7 A.   Acknowledgment sheet, yes.

8 Q.   So there's no other logbook or --

9 A.   No.

09:24:04AM 10 Q.   So you says -- you said when you write the cell location

11 of, like I was in I-2-6, that's what you would write on the

12 envelope?

13 A.   On the front of the envelope, yeah, we look up your name,

14 your DIN number, and then someone -- whose ever got your mail,

09:24:33AM 15 your legal mail would write where you're locked.  And then

16 they corresponded it through for each block.  Like one and

17 two, three and four, five and six.  And then they were all

18 placed in numerical order.

19 Q.   All right.  When a prisoner's out to court, what's the

09:25:00AM 20 procedure then?

21 A.   Same thing.  We date stamped it in, we found out he was

22 out to court, it was put in a file to be reviewed at a later

23 date to see if the inmate had returned to the facility.

24 Q.   So nothing would be written on that envelope at that point

09:25:24AM 25 if you find out he's out to court?

1  A.   No, just the date that it came in.

2  Q.   And that stamp?

3  A.   That stamp.  The only thing that would have been written

4  on the envelope if you would have changed locking locations.

09:25:40AM 5  Q.   On the out of court, when he's out of court?

6  A.   On the envelope, if you did not come back to the same

7  cell, we would have to cancel out where you were --

8  Q.   Mm-hmm.

9  A.   -- and put the new cell that you were locking in.

09:25:58AM 10  Q.   All right.  Say if out -- if OTC, that's like abbreviation

11  of out to court, right?

12  A.   Correct.

13  Q.   Right.  Say it was written on the envelope, what would

14  happen then?

09:26:24AM 15  A.   We never wrote out to court on -- well, I shouldn't say

16  never.  I should say that it was very unlikely that it would

17  ever be put out to court.  The only thing that was by

18  directive that needed to go on it was your locking -- your

19  last known locking location until you returned.

09:26:49AM 20  Q.   The same personnel that write OTC on the envelope is the

21  same person -- same one that processed the envelope?

22  A.   No.  That was -- it was sent to you -- sent to the

23  gallery, the cell block, and if you were not in your cell at

24  that point the officer would write OTC and return your legal

09:27:30AM 25  mail back to the mail room the next morning.

1  Q.   Do you use a special colored pen to write all this

2  information on the envelope?

3  A.   We had three different colored pens we used, but not for

4  any specific reason.

09:27:57AM 5  Q.   Do specific person or persons have those pens?  Like is

6  there a reason each person got a different colored pen or just

7  random?

8  A.   Just random.

9  Q.   Can you identify the person by their handwriting on the

09:28:24AM 10  envelope?

11  A.   No, sir, I'm not a handwriting expert.

12  Q.   Can you tell your handwriting on a envelope?

13  A.   Yes, sir, I can.

14  Q.   Would OTC be written on a envelope if a prisoner was not

09:28:44AM 15  out to court?

16  A.   Not unless the computer was showing that he was out to

17  court and he came back and the computer had not been updated

18  before we had done the mail.

19  Q.   What time you all do the mail?

09:29:12AM 20  A.   Mail starts at anywhere between 8 o'clock in the morning

21  and does not finish up until after -- it has to be ready to go

22  to the block by 2:30 in the afternoon.

23  Q.   All right.  So the computer would be updated like what's

24  the longest you would say?

09:29:41AM 25  A.   I cannot answer that with a definite answer.  It depends

1 upon the state system itself.

2 Q.   Would it be days?  Hours?  Minutes?  Seconds?

3 A.   It's been as short as a few minutes, it's been as long as

4 a full day.

09:29:56AM 5 Q.   Okay. A full day, all right.  So since I return from court

6 on August 2nd, 2006, a letter that was supposed to been

7 received in Elmira mail room on August 17th, 2006, would not

8 be marked OTC, correct?

9 A.   Could you re --

09:30:19AM 10 Q.   Reiterate that?

11 A.   Yes, please.

12 Q.   Since I returned to Elmira on August 2nd, 2006, a letter

13 that supposedly received in Elmira Correction Facility mail

14 room on August 17th, 2006, would not be marked OTC, right?

09:30:45AM 15 A.   No, because you would be there.  August 2nd you would

16 return, August 17th you would be in the housing unit.  We

17 would have no reason to hold it.

18 Q.   And the mark?

19 A.   We would have marked it the day that it came in on.  If

09:31:05AM 20 you said it came in on the 2nd, it would be marked the 2nd.

21 Q.   No.  No.  I'm going to read it one more time.  Since I

22 returned from court on August 2nd --

23 A.   Right.

24 Q.   -- 2006, a letter that supposedly received in Elmira

09:31:28AM 25 Correction Facility mail room on August 17th, 2006, two weeks

1  different, would not be marked OTC, right?

2  A.    Right.

3  Q.    I would like to show you something.

4            **MR. LIVINGSTON:** Your Honor, I'm going to show a

09:32:00AM 5  exhibit.

6            **THE COURT:** Give it to the courtroom deputy to mark

7  as an exhibit.

8            **THE CLERK:** Marking Plaintiff Exhibit No. 5.

9            **MR. LIVINGSTON:**  Show him?

09:32:51AM 10           **THE COURT:** Yes, show Mr. Benitez.

11           **MR. BENITEZ:**  Thank you, Mr. Livingston.  Thank

12  you.

13  **BY MR. LIVINGSTON:**

14  Q.    Do you recognize that?

09:33:33AM 15  A.    Yes, I do.

16  Q.    What is that?

17  A.    That is our date stamp.

18           **THE COURT:** What is it?  An envelope?

19           **THE WITNESS:** It's an envelope, yes, sir.

09:33:43AM 20           **THE COURT:** Thank you.

21           **THE WITNESS:** It has your locking location and the

22  date that we received it.

23  **BY MR. LIVINGSTON:**

24  Q.    How could you tell that's the day you received it, right

09:33:58AM 25  there?

1 A.   Correspondence dated.

2 Q.   Correspondence could mean the actual letter, right?

3 A.   This is the date that it actually came into our facility.

4 Q.   But correspondence could mean the letter itself, right?

09:34:21AM 5 It don't say correspondence office, correspondence unit,

6 Elmira Correction Facility correspondence, don't say nothing,

7 it just say correspondence?

8 A.   Yes, this is the stamp that we use for correspondence.

9 Q.   Yes.

09:34:40AM 10 A.   Office mail, any type of mail, even mail going to the

11 superintendent would get date stamped with this stamp saying

12 that it came from the correspondence office.

13 Q.   It don't say correspondence office itself though?

14 A.   Right, but this is -- this is the stamp that is used in

09:35:03AM 15 our office or was used in our office at the time I was there.

16 Q.   Okay. Can you look, you see the green markings like

17 somebody wrote the location and something else on it?  Do you

18 see that?

19 A.   Right here?

09:35:23AM 20 Q.   On the front of the envelope.

21 A.   Right there?

22 Q.   The location, all of that, all that I'm saying?

23 A.   Yeah, the location, that's where --

24 Q.   That's your handwriting?

09:35:33AM 25 A.   That's not my handwriting.

1  Q.   All right.  Now, you know who handwriting that is?

2  A.   No, sir, I do not.

3  Q.   All right.  You see that scribble out marking, the one you

4  was pointing at before?

09:35:54AM 5            **THE COURT:** Hang on a second.  Do you move to admit

6  Plaintiff's Exhibit 5?

7            **MR. LIVINGSTON:**  Yes, I would like to.

8            **THE COURT:** Can I see that?  Okay.  Any objection to

9  Plaintiff's Exhibit 5?

09:36:30AM 10           **THE CLERK:** 5 indicates it was a letter.  That's an

11  envelope.

12           **MR. LIVINGSTON:**  It's 4.

13           **THE CLERK:** So we need to remark it.

14           **MR. LIVINGSTON:**  Sorry, it's 4.

09:36:49AM 15          **THE COURT:** We have it marked wrong.

16           **THE CLERK:** The envelope is marked Plaintiff

17  Exhibit No. 4.

18           **THE COURT:** 4 is the same exhibit you were just

19  testifying to; is that right?

09:37:03AM 20          **THE WITNESS:** Yes, sir, it is.

21           **THE COURT:** Do you move the admission of 4?

22           **MR. LIVINGSTON:**  Yes, I would like to put that in

23  evidence.

24           **MR. BENITEZ:**  Judge, I would like to question her

09:37:10AM 25  about that, the foundation for that document.  She stated that

1 that wasn't her handwriting.  My objection would be to her

2 qualification regarding the handwritten portion of the

3 envelope.  Otherwise, I have no objection, but it's that

4 portion of the handwriting.

09:37:29AM 5     **THE COURT:** Okay.  4 will be received.

6     (**WHEREUPON**, Plaintiff Exhibit 4 was received into

7 evidence).

8     **THE COURT:** Mr. Livingston, if you want to use this

9 machine in front of us here, that way everybody can view it --

09:38:14AM 10 you can adjust that to make it smaller.  Can you show him how

11 to do that?  Okay, you may proceed.

12 **BY MR. LIVINGSTON:**

13 Q.   You see that area right there, that scribbled out in green

14 ink?

09:39:18AM 15 A.   Yes, sir, I do.

16 Q.   Can you tell what was scribbled out?

17 A.   It appears that it looks like OTC, but I'm going to say

18 that that could have been a mark made by the officer when he

19 went to deliver it and you're not in your -- you were not in

09:39:41AM 20 your cell, so he could have written OTC on that.

21 Q.   Don't it appear that it's the same ink that wrote the

22 location too?

23 A.   Those pens are used all over the facility.  Correspondence

24 has them.  Commissary has them.  Numerous other departments

09:40:07AM 25 have those pens.  We are not the only office privy to those

1  pens.

2  Q.   The correspondence is the one that wrote the cell

3  location, right?

4  A.   Definitely.

09:40:23AM 5  Q.   You can't say they definitely didn't write the OTC either?

6  A.   I just told you that I was sure definitely that they did

7  write the locking location.  I cannot say that the OTC was not

8  written by -- was written by our office.

9  Q.   But --

09:40:46AM 10  A.   We would have -- we would have scribbled it out if it came

11  back to us and -- and if you were out to court say on

12  Wednesday, it showed your locking location as I-2-6.  If it

13  came back to us and if the officer the night before had

14  written OTC on it, and it would have came back to us we

09:41:20AM 15  relooked up where you were, we would have scribbled that --

16  OTC out and sent it back the next day.

17  Q.   Oh, so since I arrived back into the facility on

18  August 2nd, that wouldn't occur then what you just described?

19  A.   It depends, like I said, the information that comes from

09:41:53AM 20  the draft area or whatever is not always updated as early as

21  we do the mail.

22       You could have been -- when we saw it, the

23  information on the screen could have said that you were in

24  I-2-6.  Or it could have said you were out to court.  If it

09:42:22AM 25  said that you were in your cell, then we would have put I-2-6

1  on it and it would have been sent to the block.  If the

2  officer there, the mail officer there, did not physically see

3  you there, and went back to his station and found out that you

4  were out either on medical, out to court, whatever, they could

09:42:52AM 5  have put OTC.

6  Q.   So you already said that by the 15 day lapse from the

7  August 2nd of my return to the August 17th when the letter was

8  delivered, that a computer would have been updated already and

9  then I would have been in that cell that you wrote on the

09:43:25AM 10  envelope so there wouldn't be no discrepancy if I was in or

11  out to court?

12  A.   It says the day that we received it on the bottom.  The

13  receipt date and the date that it is postmarked up there does

14  not necessarily mean that we received it in our facility

09:43:48AM 15  before that date.

16  Q.   That's the discrepancy now.

17        Is there other places where the officer would make

18  these corrections you speak about?

19  A.   He would on the -- on the legal log if it comes with the

09:44:15AM 20  paperwork, it states on it that they ask you to sign for it,

21  sometimes it would come back saying refused to sign.

22  Q.   Specifically he would have, like you just saying, that he

23  would have marked it on there, scribbled it out or whatever,

24  in that?

09:44:39AM 25  A.   I said -- I said we would scribble it out.

1  Q.   And he would have put the OTC on there?

2  A.   He may have.

3  Q.   So --

4  A.   I cannot tell you what is done on the opposite end.  I

09:44:52AM 5  only see it up until it is put in the envelope, the manila

6  envelope, and taken and put in the canvas bag and taken to the

7  other side of the jail.

8  Q.   All right.  So there's other document for that officer

9  that delivered the mail to put whatever remarks he want to put

09:45:16AM 10  beside putting on the envelope, right?

11  A.   Correct.

12  Q.   I like to show you another exhibit.  Excuse me for a

13  second.

14       **THE CLERK:** Plaintiff's Exhibit No. 10.

09:47:02AM 15       **MR. BENITEZ:**  Thank you.

16       **THE COURT:**  Yes, you can show the witness the

17  exhibit.

18  **BY MR. LIVINGSTON:**

19  Q.   Do you recognize that exhibit?

09:47:26AM 20  A.   Yes, I do.  It's the receipt of legal mail that goes over

21  with the vinyl -- goes inside the vinyl pouch with the legal

22  mail.

23  Q.   That's what the prisoners sign when they get they mail?

24  A.   This is what they should sign, yes.

09:47:55AM 25  Q.   And that's where remarks by the officers would be listed

1 or written?

2 A.   Correct.

3 Q.   All right.  You see that first one, the first page of the

4 exhibit, I think it's July 26th, '06?

09:48:16AM 5 A.   Yes, sir.

6 Q.   Do you see the remarks that was made?

7 A.   It says "hold live" and it says "out to court."

8 Q.   Let me see it.  I would like to let the jury see it also.

9        **THE COURT:** Hang on before you put it on there.  You

09:48:33AM 10 move its admission?

11        **MR. LIVINGSTON:**  Yes.

12        **MR. BENITEZ:**  No objection, Judge.

13        **THE COURT:** Plaintiff's Exhibit 10 will be received.

14 Let the clerk mark it first, then you can display it to the

09:48:44AM 15 jury.

16        (**WHEREUPON**, Plaintiff's Exhibit 10 was received

17 into evidence).

18 **BY MR. LIVINGSTON:**

19 Q.   That exhibit is how you remember these acknowledgment

09:49:10AM 20 receipts to be the one on the screen?

21 A.   Yes.

22 Q.   All right.  You see there's some handwritten area over on

23 the first one, that's the one I was supposed to get on that

24 date right there.  You see it?

09:49:39AM 25 A.   All right.  Clerk U.S.

1  Q.   Yes, that one.

2  A.   Okay.

3  Q.   You see the remark in the remark area?

4  A.   Hold live.

09:49:50AM 5  Q.   Then it's another one over there where the -- it says

6  signature, inmate's signature and date and CO signature and

7  date.  You see that OTC?

8  A.   Correct.

9  Q.   Who would have wrote that?  Who would write that right

09:50:05AM 10 there?

11  A.   Well, the hold live may have come from the block because

12  that looks similar to the 7/26/06 with the line and the -- it

13  seems to be -- to me it looks like maybe a officer's

14  signature.  The OTC could have been -- the one on the bottom

09:50:41AM 15 could have been the officer that delivered to one and two

16  gallery and the OTC could have been to -- from the officer

17  that actually handed out the mail to the -- they have officers

18  for every floor.

19  Q.   Yeah.  So -- may I have the rest of them?

09:51:13AM 20  A.   Sure.

21           THE WITNESS: Judge --

22           THE COURT:  Is this a different exhibit?

23           MR. LIVINGSTON:  It's part of the whole thing.

24           THE COURT: Two-page exhibit?

09:51:39AM 25           MR. LIVINGSTON:  4.

1          **THE COURT:** 4 page exhibit.  So number 10 is a 4

2     page exhibit.

3               **THE WITNESS:** Judge, I just want to clarify hold.

4               **THE COURT:** What's hold live?  Explain to the jury.

09:51:49AM 5               **THE WITNESS:** All right.  Hold live is, that means

6     that he is either on his way out to court or out -- he's

7     taking a trip somewhere.  It doesn't -- it doesn't

8     necessarily -- it doesn't necessarily mean court trip.  It

9     could mean medical trip, it could be just a day trip.  It

09:52:12AM 10     could be an overnight trip.  Hold live means that he is

11     supposed to be returning to the same cell, but that person is

12     not in their cell at that time.

13               **THE COURT:** Okay, thank you.

14     **BY MR. LIVINGSTON:**

09:52:28AM 15     Q.   But the OTC, that specific out to court, right?

16     A.   Yes, but I'm just explaining hold live.

17     Q.   All right.  Bring your attention to the August 17

18     acknowledgment of receipt list.  You see where my signature

19     after four letters was received by me?

09:53:05AM 20     A.   Yes, over in the very last column.

21     Q.   Okay. So there's no remark like to explain what you was

22     saying about the officer would -- might have or would have --

23     A.   Each officer does their own thing.  I cannot control how

24     they were taught.

09:53:34AM 25     Q.   So that's where they would have put that remark though,

1　right?　Instead of on the envelope?

2　A.　Like I said, I can't answer that specifically because I

3　don't know how -- which officers were taught which way.

4　Q.　So the OTC -- what you was saying about this OTC that was

09:54:12AM 5　scribbled out before?

6　A.　That if it went over, it could -- we would have scribbled

7　out if it came back to us, if an officer would have put the

8　OTC because if you were hold live, still not in there, he

9　could have put on OTC at the time and then it would have come

09:54:42AM 10　back without making -- without crossing out the OTC, he would

11　have probably not tried to deliver it again.

12　Q.　But by that time, by the August 17th, 2006, I wasn't hold

13　live no more.　I was actually in that cell so he wouldn't be

14　necessary to put OTC on there?

09:55:15AM 15　　　　　**MR. BENITEZ:**　Object to the form of the question.

16　　　　　**THE WITNESS:** I'm getting confused.

17　　　　　**THE COURT:** All right, sustain the objection.　Do

18　you want to rephrase your question?

19　**BY MR. LIVINGSTON:**

09:55:24AM 20　Q.　Since I returned to that cell that was written on the

21　envelope, on this letter that I supposedly received on

22　August 17th, 2006, then that person wouldn't have put OTC on

23　it -- on the envelope to indicate I was out to court?　They

24　would just write the cell location?

09:55:54AM 25　A.　In our -- like I said, the remarks are for the officers,

1  the cell block location -- whatever the officers want to write

2  in there.

3          We don't write anything other than the name, the

4  sender and the cell location.

09:56:19AM 5  Q.   Oh, you talking about on the acknowledgment receipt?

6  A.   Right.

7  Q.   So the officer was wrong for putting the OTC on this

8  envelope if he did it?

9              **MR. BENITEZ:**  Objection.

09:56:36AM 10             **THE COURT:** Sustained to the form of the question.

11  **BY MR. LIVINGSTON:**

12  Q.   Is defendant William Bills your supervisor?

13  A.   Yeah, he was.

14  Q.   And defendant R.N. Whitten is his supervisor?

09:57:15AM 15  A.   Yes, she was.

16  Q.   So orders or commands, I don't know how to say it without

17  might offend people, but if orders or commands coming down it

18  would be in that chain of command like that?

19  A.   I would be the lowest one on the totem pole.

09:57:40AM 20  Q.   And you have some people under you, too, right?

21  A.   Yes.

22  Q.   So defendant Whitten wouldn't directly come to you and say

23  do this, do that?

24  A.   Not normally.

09:58:08AM 25  Q.   Sometimes she'll skip defendant William Bills and just

1   come to you?

2   A.   She made rounds, but, no, usually -- usually everything

3   goes by the chain of command.

4   Q.   Directive 4015 is the policy and procedure that you follow

09:58:44AM 5   regarding legal mail when a prisoner out to court?

6   A.   I don't remember at this time.  I have been out of the

7   mail room for six plus years.  Five, six plus years.

8   Q.   So that directive would be followed like strictly like

9   what it says, that's what -- how things operate?

09:59:19AM 10   A.   When a directive is put out there we are -- we are

11   compelled to adhere to it as closely as possible.

12   Q.   A change sheet is used to verify prisoner's location and

13   the status in the facility, right?

14   A.   A what?

09:59:59AM 15   Q.   A change sheet?

16   A.   No, we didn't get change sheets.  Ours came up on a

17   computer --

18   Q.   Oh.

19   A.   -- which is generated from probably the chart office.

10:00:19AM 20   Q.   So every day you check this computer to see?

21   A.   Every day we use that to make locations of where inmates

22   are housed.

23   Q.   I like to show you directive --

24        **THE COURT:**  Is that Exhibit 18?

10:01:02AM 25        **MR. LIVINGSTON:**  Yes.

1          **THE CLERK:** Plaintiff's Exhibit No. 18.

2          **THE WITNESS:** Thank you.

3    **BY MR. LIVINGSTON:**

4    Q.   The first page might be a revision or something they

10:02:22AM 5    changed, but you could go to the second.

6          **THE COURT:** What is 18?

7          **THE WITNESS:** Revision notice, forward inmate mail.

8          **THE COURT:** Thank you.

9    **BY MR. LIVINGSTON:**

10:03:01AM 10   Q.   Does that refresh your recollection?

11   A.   This directive forward of inmate mail is concerning when

12   they transfer to another facility for a long -- a length of

13   time or they are released from corrections or whatever.  This

14   is -- this is not pertaining to legal mail.

10:03:31AM 15   Q.   How about that -- let me see that.  How about paragraph 3?

16   A.   Out to court.  It says the correspondence unit, upon

17   notifying via the mail change sheet places an inmate on out to

18   court status, shall hold all mail received for that inmate

19   until such time as what you said, a change of order and a

10:04:26AM 20   change of address order is -- is meaning you are either being

21   sent to another facility, being released, or maybe in a

22   hospital for a lengthy period of time.  The other part of it

23   says until the inmate returns from court.

24   Q.   So your office do use that directive to set they policies

10:05:03AM 25   and procedures?

A.    Yes.  And there's -- there's two other directives that are

more specific.

Q.    What's those directive?

            May I put this in evidence?

10:05:21AM    THE COURT: Do you have any objection to the

admission of Exhibit 18?

            **MR. BENITEZ:**  No objection, Judge.

            **THE COURT:** Exhibit 18 will be received.

Mr. Livingston, you can give it to the clerk so she can mark

10:05:32AM it received.

            (**WHEREUPON**, Plaintiff Exhibit 18 was received into

evidence).

            **THE COURT:** Thank you.

**BY MR. LIVINGSTON:**

10:05:47AM Q.    So according to this, a change sheet is supposed to be

used to find out when I left the facility and when I arrived

back into the facility, right?

A.    A change sheet, one, if you are going to be in another

facility, we would get notified that you were going.  It's

10:06:10AM not -- it's not a handwritten -- it's not a piece of paper for

people going out to court or people that are going to the

hospital.

            The change of address, which that one states, is if

you are being released and it is giving -- given to you, I

10:06:34AM believe, by IRC when you are being released from court so that

1    we could forward any legal mail to the new address that you

2    are physically -- is going to be your home outside of the

3    correctional department.

4    Q.    You saying that this document pertained to legal mail

10:07:15AM 5    being held in --

6    A.    It is -- it pertains to legal mail, regular mail, your --

7    if you were subscribing to a magazine, a change of address, we

8    have what are white cards -- had white cards that inmates

9    would write where their next location would be so that we

10:07:46AM 10   could forward that -- forward any type of mail that we

11   received after they were released from custody to that new

12   address.

13   Q.    You can see that?

14   A.    Out to hospital.

10:08:10AM 15   Q.    You see paragraph C?

16   A.    If the inmate has not filed a change of address form, all

17   mail, including legal mail, will be held --

18   Q.    Until the inmate's return.

19   A.    Right, but the change of address, I believe, is the white

10:08:36AM 20   card.

21   Q.    All right.  Do you see that the sentence after that one?

22   A.    Yeah, there's a form letter that goes to the -- to the

23   legal entity that sends you the mail saying that, you know,

24   we've either forwarded it to the new housing that you're --

10:09:07AM 25   you're at.  Flip the page over, if you've got the -- the --

1  Q.   That's it.  So you think these procedures was done?

2  A.   To the best of my knowledge.

3  Q.   All the time?

4  A.   To the best of my knowledge.

10:09:42AM 5  Q.   Okay. So each procedure in this directive 4015 is always

6  followed to its word?

7            **MR. BENITEZ:**  Objection.  Calls for speculation.

8            **THE COURT:** No.  Overruled.  You can answer that.

9            **THE WITNESS:** To the best of my knowledge.

10:10:03AM 10  **BY MR. LIVINGSTON:**

11  Q.   So there's no change sheet coming to your office to notify

12  you of certain activities that is described in there?

13  A.   Since they went to computers, we received changes mainly

14  through access to a program that was on the computer.

10:10:33AM 15  Q.   And what year was this that the computer took over?

16  A.   Before my -- before my getting to the -- they've had

17  computers since before I started.

18  Q.   So since you been there it's always been computerized?

19  A.   Yes.

10:10:52AM 20  Q.   And what year was that?

21  A.   I believe I was there in 2005, 2006 and 2007, I think.

22  Q.   They still make these hard copies so to speak?

23  A.   They have -- they have hard white copies that are kept in

24  a file for, as I stated before, prisoners or inmates who have

10:11:36AM 25  left the custody of the State.

1  Q.   So it's no picking and choosing which part of this

2  directive to follow, right?

3  A.   If the inmate didn't -- didn't provide us with a change of

4  address, there's nothing I can do to make him.

10:12:06AM 5  Q.   I'm talking about what the directive describes saying that

6  you should follow and do?

7  A.   We do all -- we adhere to that directive to the best of

8  our ability.

9  Q.   Did anyone tell you to circumvent the directive?

10:12:34AM 10  A.   No one's ever told us to circumvent a directive.  We can

11  be reprimanded for circumventing a directive.

12  Q.   So this directive is on your computer?

13  A.   It is now under a share drive.  At the time I'm not sure

14  that it was.

10:12:59AM 15  Q.   So how would you know about it if the computer --

16  A.   Because we kept directives that pertained to our area in

17  our office.

18  Q.   So you used both the computer and a hard copy directive?

19  A.   The directive, yes.  We have a hard copy of the

10:13:22AM 20  directives.  And the directives are also now on a shared

21  drive.

22  Q.   You only looked at the computer when -- to see if I was

23  back -- if I was back in that facility?  You wouldn't check

24  the change sheet?

10:13:46AM 25  A.   We look up every piece of mail on the computer to locate

1  the person -- where his housing unit was every day.

2  Q.   Every day?

3  A.   Every day.  For the mail that came in that day.  We use

4  the computer every day to look up inmate housing.

10:14:15AM 5  Q.   Do you know a prisoner named Kaleb Gould, G-O-U-L-D?

6           **MR. BENITEZ:**  Objection, Your Honor, relevancy.

7           **THE COURT:** I don't know where he's going with it,

8  overruled.  Do you know him?  Do you know that person?

9           **THE WITNESS:** No.

10:14:33AM 10           **THE COURT:** Thank you.

11           **MR. LIVINGSTON:**  That's it for now.

12           **MR. BENITEZ:**  Thank you, Judge.

13           I'm looking for Plaintiff's Exhibit No. 4.  I

14  believe it's the envelope.

10:15:18AM 15           **THE COURT:** Do you have that, Mr. Livingston?

16           **MR. LIVINGSTON:**  I do.

17           **THE COURT:** In the future we'll keep the received

18  exhibits with the clerk, that way we won't be losing them.

19           **MR. LIVINGSTON:**  Okay.

10:15:30AM 20           **MR. BENITEZ:**  And Exhibit No. 10 -- or yes,

21  Exhibit No. 10.

22           **THE COURT:** Three exhibits received: 4, 10 and 18.

23           **MR. BENITEZ:**  In the interim I can proceed?

24           **MR. LIVINGSTON:**  Here you go.

10:15:51AM 25

**CROSS-EXAMINATION**

**BY MR. BENITEZ:**

Q.   Ms. Gates, who are you employed by?

A.   The Department of Correctional Services at Elmira.

Q.   Okay. And for how long have you been working for the Department?

A.   20 plus years.

Q.   And presently what capacity are you employed by the Department?

A.   Payroll Examiner II.

Q.   How long have you been in that capacity?

A.   Approximately four years.

Q.   And prior to that what position did you hold?

A.   Senior mail and supply clerk.

Q.   And do you remember approximately when you transferred from that position to your present position?

A.   I want to say March of 2009.  I think it was March of 2009.  I'm not completely positive.

Q.   Okay. Now, going back to July and August of 2006, you held the position of senior mail clerk; is that correct?

A.   Yes.

Q.   And as part of that position you supervised other clerks within that office, correct?

A.   Correct.

Q.   Earlier you testified about this particular exhibit which

1   is Plaintiff's Exhibit No. 4.  And you were asked a question

2   about the writing on the envelope.  Do you recognize that

3   writing?  Do you recognize that writing to be yours?

4   A.    No.

10:18:14AM 5   Q.    Was it your testimony that someone in the correspondence

6   department writes the inmate's cell location on the envelope?

7   A.    Yes, sir.

8   Q.    And whoever wrote that cell location on Plaintiff's

9   Exhibit No. 4, is that the person who would have handled his

10:18:51AM 10  mail that day?

11  A.    To my knowledge, yes.

12  Q.    Based on your knowledge and experience and practice, the

13  person who was handling the inmate's mail is the one that puts

14  down the inmate's cell number and location -- inmate cell

10:19:12AM 15  location on the envelope; is that correct?

16  A.    Correct.

17  Q.    You were also asked about the process of sorting incoming

18  mail at the facility, correct?

19  A.    Correct.

10:19:26AM 20  Q.    With regards to legal mail and was this -- looking at this

21  envelope, can you tell what type of correspondence this would

22  have been?

23  A.    Yes, looking up -- if you bring the screen down a little

24  bit, you can see right there it says State of New York.

10:19:49AM 25  Anything that says State of New York, even if it didn't say

1  Court of Appeals, is considered legal mail.

2  Q.   And according to your knowledge and practice, was this

3  correspondence, this envelope, ever opened in the

4  correspondence office?

10:20:16AM 5  A.   Not to my knowledge.

6  Q.   According to your practice, would it have been opened in

7  the correspondence department?

8  A.   There has been -- I will -- I'm telling you the truth,

9  there has been legal mail that has been inadvertently opened

10:20:36AM 10  because of not a clear return address, human error, very

11  infrequently.  So I cannot say never.

12  Q.   Okay. But in this particular instance looking at the

13  sender's address, is that clear to you --

14  A.   Yes.

10:20:59AM 15  Q.   -- who the sender is?

16  A.   Yes.

17  Q.   Would there have been any reason to open that envelope in

18  the correspondence office on that particular date that it was

19  received?

10:21:09AM 20  A.   No.

21          MR. LIVINGSTON:  Excuse me.  Objection, she already

22  say it could have been inadvertently opened.

23          THE COURT: Overruled.  The answer will stand.

24  BY MR. BENITEZ:

10:21:21AM 25  Q.   In any event, were you the person that handled this

1  envelope on the date that it was received on August -- on

2  August 17, 2006?

3  A.   No.

4  Q.   Based upon your experience and knowledge as a senior mail

10:22:18AM 5  clerk, are you familiar with the U.S. stampage?

6  A.   Yes.

7  Q.   Now, looking at Plaintiff's Exhibit No. 4, are you

8  familiar with that type of postage stamp?

9  A.   Yes.

10:22:35AM10  Q.   And what is it?

11  A.   It's a postage stamp that many of the facilities use.

12  It's from Pitney Bowes.  They're the one that supplies the

13  machine that we run -- well, at the time were running the mail

14  through, and other facilities have the same stamp, same sort

10:23:02AM15  of stamps issued to them and you get your postage meter filled

16  and then it's processed through a Pitney Bowes machine.

17  Q.   Based upon your knowledge and practice, does this Pitney

18  Bowes postage stamp, is that the same thing as a U.S. Postal

19  Service postmark?

10:23:30AM20  A.   Absolutely not.

21  Q.   Why not?

22  A.   Because the U.S. Postal Service does not have a Pitney

23  Bowes logo under it.

24  Q.   Early in your testimony you stated that you sorted three

10:23:58AM25  types of mail: They were, one, legal -- inmate legal mail?

1  A.   Correct.

2  Q.   The second one, facility mail?

3  A.   Correct.

4  Q.   And then there was a third one, which was the inmate

10:24:11AM 5  personal mail; was that correct?

6  A.   Correct.

7  Q.   How did the correspondence department prioritize those

8  correspondence coming to the facility?

9  A.   Well, first thing, everything had to be sorted and then

10:24:32AM 10  legal mail took top priority.  Then the mail that was going to

11  employees in the facility was secondary.  Then we, third and

12  final, was the personal mail, inmate families writing letters,

13  and then after that came magazines and garbage mail.

14  Q.   So is it your testimony that legal mail took priority

10:25:12AM 15  above the other correspondence received at the facility?

16  A.   Yes.

17  Q.   This is -- this has been entered and received by the Court

18  as Plaintiff's Exhibit No. 10, it consists of four pages.  I

19  just want to go to the second page.

10:26:22AM 20           **MR. LIVINGSTON:**  Your Honor, may I?  I think she

21  might -- can you see?

22           **THE JUROR:**  I can't read what it says.

23           **MR. LIVINGSTON:**  She can't really see.

24           **THE COURT:**  Are you having difficulty seeing it?

10:26:33AM 25           **THE JUROR:**  Well, I can see it, but I can't read

1  what it says.

2          **THE COURT:** Okay.

3          **MR. BENITEZ:**  Well --

4          **THE COURT:** Can you see any better?

10:26:44AM 5          **THE JUROR:** A little bit.

6          **THE COURT:** Okay. That's juror number 8 by the way.

7  **BY MR. BENITEZ:**

8  Q.   Early in your testimony you stated that you were familiar

9  with this particular record, correct?

10:27:04AM 10 A.   Yes, sir.

11 Q.   Okay. For what date is this record?

12 A.   8/11 of '06.

13 Q.   Okay. And looking at this particular document, does it

14 appear that Mr. Livingston received legal mail on that

10:27:20AM 15 particular date?

16 A.   Well, I'm sure he did -- if you brought it up a little

17 bit.

18 Q.   Okay.

19 A.   Yeah, he's second from the bottom.

10:27:36AM 20 Q.   That's not very good, but okay.  Let's go over this a

21 little bit.  Based upon your review of that document, and

22 based upon your experience and knowledge, does that appear

23 that Mr. Livingston received his legal mail on August 11 of

24 2006 from the -- the New York State Attorney General's office?

10:28:13AM 25          I can just hand it to her and come back.

1          **THE WITNESS:** New York State Supreme Court, New York

2    State library, New York State library, New York State Attorney

3    General Office.

4    **BY MR. BENITEZ:**

10:28:29AM 5    Q.    Now, each column has like a title, so the first column has

6    DIN on it.  Can you explain to the jury what DIN means?

7    A.    It's their DIN number, that's the first two numbers

8    represents the year that they were incarcerated.

9              The letter is from a region.

10:29:15AM 10             And it looks like he was the 985th person to be

11    convicted that year.

12    Q.    Look to the far right column, if you look for that -- if

13    you look across where the DIN number is to where it appears to

14    be a signature area, does that appear to be a signature in

10:29:52AM 15    that place?

16    A.    Yes, sir, it does.

17    Q.    Okay. Okay.  This is Defendant's Exhibit No. 10 and it's

18    the third page of that exhibit.  Based upon your review of

19    that document, can you tell whether or not Mr. Livingston

10:30:34AM 20    received legal correspondence on August 15th, 2006?

21    A.    Yes, I can.

22    Q.    Okay. And what can you tell from that document?

23    A.    His DIN number is there, and his name is there, and it

24    says Clerk of the U.S. -- Clerk U.S. District -- all right,

10:31:06AM 25    Clerk, U.S. District Court of Syracuse.

1  Q.   By the way, "cell location," can you tell from that

2  document what his cell location was?

3  A.   Yes, I-2-6.

4  Q.   Looking back at Plaintiff's Exhibit No. 4, is that

10:31:38AM 5  consistent with his cell location for the envelope that was

6  received on August 17th, 2006?

7  A.   Yes, sir, it was.

8  Q.   All right. Now, looking at Plaintiff's Exhibit No. 10, the

9  fourth page, you recognize that document, right?

10:32:29AM 10  A.   Yes, sir, I do.

11  Q.   Okay. And based upon your review -- based upon your

12  knowledge and experience as a mail -- senior mail clerk for

13  the Elmira Correctional Facility, can you tell whether or not

14  Mr. Livingston received legal mail on that date, which is

10:32:45AM 15  August 17, 2006?

16  A.   Yes, I can.

17  Q.   Okay. And how many?

18  A.   Four.

19  Q.   And is there a description of the correspondence?

10:33:00AM 20  A.   Yes, sir, there is.

21  Q.   Okay. Can you based upon the description of the

22  correspondence there, looking at that document and then

23  looking at the envelope that was received from the New York

24  State Court of Appeals, is that consistent with the fact that

10:33:18AM 25  the facility received the envelope on August 17, 2006?

1  A.   Yes, sir, it is.

2  Q.   And based on your review of those documents and based upon

3  your knowledge and practice, did you handle the plaintiff's

4  correspondence, his legal correspondence from the New York

10:34:39AM 5  State Court of Appeals on August 17, 2006?

6  A.   To the best of my knowledge, no.

7           **MR. BENITEZ:**  Thank you, nothing further.

8           **THE COURT:** Do you have any additional questions?

9           **MR. LIVINGSTON:**  Yes, thanks.

10:35:00AM 10           **THE COURT:** Go ahead.

11                      <u>**REDIRECT EXAMINATION**</u>

12  **BY MR. LIVINGSTON:**

13  Q.   How do you know what the DIN means?  You like broke it

14  down.  I don't even know that.

10:35:19AM 15           **THE COURT:** Now you do, right?

16           **THE WITNESS:** It was explained to me years ago.

17  Back when I first started.

18  **BY MR. LIVINGSTON:**

19  Q.   I don't know.  I don't know if they told you the right

10:35:41AM 20  way.

21           **MR. BENITEZ:**  Objection, it's not relevant.

22           **THE COURT:** Sustained.  You can't make comments, you

23  can ask questions though, not comments.

24           **MR. LIVINGSTON:**  Okay.

10:35:49AM 25  **BY MR. LIVINGSTON:**

1  Q.    This bows -- what did you call that?

2  A.    Pitney Bowes.

3  Q.    Pitney Bowes stamp, that's a legitimate stamp, correct?

4  A.    It's a legitimate stamp, but big businesses, departments

10:36:11AM 5  of corrections have their own mail machines that they can run

6  them through and then take them to the post office.

7  Q.    Oh, so the post office recognize that stamp?

8  A.    Yes.

9  Q.    So that means they wouldn't override it?  If the

10:36:40AM 10  information is correct on there, they wouldn't override it?

11          **MR. BENITEZ:**  Objection, form.

12          **THE COURT:** Overruled.  If you understand that, do

13  you?

14          **THE WITNESS:** To my knowledge, there -- that -- that

10:36:55AM 15  stamp that is placed on there would not -- would have no

16  reason to be overridden by the Federal Government.

17  **BY MR. LIVINGSTON:**

18  Q.    Okay.

19  A.    It's -- from my experience, it's a legal entity that big

10:37:18AM 20  businesses can use.

21  Q.    So you see that date on there July 26th, 2006?

22  A.    Yes.

23  Q.    So that would mean that that's the date the post office

24  received that letter?

10:37:41AM 25          **MR. BENITEZ:**  Objection.

1          **THE COURT:** Overruled.  Sustained.

2   **BY MR. LIVINGSTON:**

3   Q.   If the post office didn't receive that letter on that

4   date, would they override it to your knowledge?

10:37:58AM 5   A.   I have no knowledge, I'm not a postal employee.

6   Q.   To your recollection, you ever seen like this stamp and

7   then the post office stamp?

8   A.   Not to my knowledge.

9   Q.   How long a letter from Albany usually takes to come to

10:38:29AM10  Elmira facility?

11  A.   It could vary.  Variables are, you know, when the person

12  actually stamped it, when it was -- when -- if they have mail

13  in an out box that's only picked up certain times of the day,

14  once a day, twice a day, and they take theirs to the Postal

10:39:03AM15  Service.  It could sit around days after it's been --

16  Q.   So how many times do Elmira pick up they mail?

17  A.   We only pick -- we pick up our mail once a day.

18  Q.   Once a day.  So a letter mailed from Albany on that date

19  right there should have arrived when would you say?

10:39:26AM20          **MR. BENITEZ:**  Objection, it assumes facts not in

21  the record, Judge.

22          **THE COURT:** Overruled, if she knows.  She's an

23  experienced mail clerk.

24          **THE WITNESS:** Depending upon holidays, whether it

10:39:39AM25  was a weekend, an approximate good average would be anywhere

1 | from five to seven business working days.

2 | **BY MR. LIVINGSTON:**

3 | Q.    So say this was a Wednesday right here.  And it was --

4 | A.    We may have not gotten it until the following Monday.

10:40:03AM 5 | Assuming that that was actually taken to the post office the

6 | date that it was stamped.

7 | Q.    If it wasn't taken that day, then the post office would

8 | have say that's not a legitimate stamp?

9 | A.    Do you get pre-stamped envelopes when you have to send

10:40:27AM 10 | something back from the court?

11 | Q.    Yeah, but it's not dated.

12 | A.    Well, I've seen some that are dated.  I've sent things

13 | that are back to a specific agency that are dated.

14 | Q.    All right.  So you said about a week.  Seven days, right?

10:40:51AM 15 | A.    Right.

16 | Q.    So what you say when you see that that's the date it was

17 | received right there?

18 | A.    I cannot tell you what happened from the time that it was

19 | postmarked from the Court to the time that it entered our

10:41:12AM 20 | facility on the 17th of August.

21 | Q.    That's like 22 days.

22 | A.    I still have no knowledge of what the person or persons

23 | did with it from the time it left their office until the time

24 | that we received it in ours.

10:41:36AM 25 | Q.    You ever seen mail take that long?

1  A.   I've seen mail that's taken longer than that.

2  Q.   What kind of mail?

3  A.   Personal check.  They didn't receive it for close to two

4  years.

10:41:52AM 5  Q.   There was a personal envelope letter?

6  A.   Yes.

7  Q.   All right.  Did you get my grievance that was written by

8  me regarding this issue right here?

9  A.   I don't recall.  I'm sure if you wrote me one, I probably

10:42:20AM 10  responded to it.

11  Q.   I ain't write you one personally.  I wrote the issue, not

12  getting my mail.

13          **MR. BENITEZ:**  Objection, form.

14          **THE COURT:** Sustained, that will be stricken.  Can't

10:42:32AM 15  make remarks.  Just ask questions.

16          **MR. LIVINGSTON:**  Yes.

17  **BY MR. LIVINGSTON:**

18  Q.   Let me show you your response to the previous --

19          **MR. BENITEZ:**  Judge, I'm going to object.  This

10:42:45AM 20  wasn't in the same line of cross-examination, it goes beyond

21  my scope of cross-examination.

22          **THE COURT:** No, I'll allow it.  Overruled.

23  **BY MR. LIVINGSTON:**

24  Q.   9?

10:43:45AM 25          **THE CLERK:** Plaintiff's Exhibit No. 9 is marked.

**BY MR. LIVINGSTON:**

Q.   That's you?

        **THE COURT:** You're referring to Exhibit No. 9?

        **MR. LIVINGSTON:**  Yes.

        **THE COURT:**  What's Exhibit No. 9?

        **THE WITNESS:** It is a memo to William Bills from myself dated August 22nd concerning a grievance number EL-31-144-06 from Mr. Livingston.

        **THE COURT:** There's three pages?

        **MR. LIVINGSTON:** Yes, but I just want to use that one for her.

        **THE COURT:** So you're using page 1?

        **MR. LIVINGSTON:**  Yes.

        **THE COURT:** Thank you.

        Do you have a question?

        **MR. LIVINGSTON:**  Yes, can I put this into evidence?

        **THE COURT:** Are you going to move it?

        **MR. LIVINGSTON:**  Move it?

        **THE COURT:**  Move it into evidence.

        **MR. LIVINGSTON:**  Yes, I like to move it into evidence.

        **MR. BENITEZ:**  I'm going to object if it's incomplete, Judge.  I would like to have a complete document presented --

        **MR. LIVINGSTON:**  But --

1          **MR. BENITEZ:** -- if she's going to be questioned

2     about it and it's going to be entered.  He's only presented

3     one part of it.

4          **THE COURT:** Do you have the other two pages?  Any

10:46:20AM 5     reason not to admit all of them?

6          **MR. BENITEZ:** Judge, I don't have objection to the

7     first two memos.  There's a third memo that seems unrelated,

8     it's related -- tangentially related.

9          **THE COURT:** You wanted -- just wanted them all in,

10:47:31AM 10     now you don't want them all in?

11          **MR. BENITEZ:** Judge, I don't mind having them all

12     in.  I'll have them all in, I have no objection to all of them

13     coming in.  It seems to me this should be -- it's only

14     exhibit, but I have no objection, you're correct, Judge, but

10:47:46AM 15     it's presented to the Court and to the jury, I thought it

16     would be better in two separate --

17          **MR. LIVINGSTON:** All three of them is investigation

18     report to the grievance that I spoke about.  There's one --

19     each of them is from the defendants Whitten, William Bills and

10:48:03AM 20     her, Ms. Gates.

21          **THE COURT:** All right.  Well, they probably should

22     be three separate exhibits then sounds to me.

23          **MR. LIVINGSTON:** I didn't do it that way, so excuse

24     me.

10:48:14AM 25          **THE COURT:** That's okay, we can make it -- make the

1  first sheet 9A, okay?  9A will be received.

2          (**WHEREUPON**, Plaintiff's Exhibit 9A was received

3  into evidence).

4          **THE COURT:** If you want to mark the other sheets 9B

10:48:37AM 5  and 9C you can.  I'm not sure you can have it received through

6  this witness, though.

7          **MR. LIVINGSTON:**  Yeah.

8          **THE COURT:** Okay.

9          **MR. LIVINGSTON:**  I would like to put 9A into

10:48:46AM 10  evidence.

11         **THE COURT:** Yeah, I said it's received, 9A is

12  received.

13         **MR. LIVINGSTON:**  Okay, thank you.

14  **BY MR. LIVINGSTON:**

10:49:07AM 15  Q.  Do you remember making that memo right there?

16  A.  Yes, I do.

17  Q.  You see in the second sentence -- you can read it, right?

18  A.  Right.  It says this office checks the out to court

19  holding files at least once a week or more if time allows.  If

10:49:34AM 20  inmate Livingston was aware that legal mail --

21  Q.  No, not -- you going ahead of me.  You see where it says,

22  the first one it says "I checked"?  Can you read that?

23  A.  I checked our files and I do see that inmate Livingston

24  did have four pieces of legal mail that were sent to him on

10:49:59AM 25  8/17/06.

1  Q.   All right.  You see that word, that word "were" it don't

2  match up to the script of it, font or --

3  A.   That's because I made a mistake in my verbiage and my

4  senior -- my supervisor Mr. Bills corrected it for me.

10:50:25AM 5  Q.   So why didn't use the -- oh, he corrected it, not you?

6  A.   Right.

7  Q.   So he erased whatever word was there?

8  A.   It was misspelled.

9  Q.   What?  What word was that?

10:50:40AM 10  A.   Let me see the paper and I can tell you.  I think it

11  was was.

12  Q.   Was misspelled?

13  A.   I'm almost positive it was a was that was sent to him

14  instead of were.

10:51:00AM 15  Q.   Okay. So that's what they call that English -- that would

16  be some kind of English thing incorrect?

17  A.   Incorrect --

18        **MR. BENITEZ:** Objection.

19        **THE COURT:** Grammar.

10:51:14AM 20        **THE WITNESS:** Grammar.

21        **MR. LIVINGSTON:**  Grammar.  Oh, it's grammar.

22        **THE WITNESS:**  Grammar.

23  **BY MR. LIVINGSTON:**

24  Q.   So he was concerned about your grammar in this, that's it?

10:51:24AM 25        **MR. BENITEZ:** Objection, asked and answered.

1          **THE COURT:** Sustained.

2    **BY MR. LIVINGSTON:**

3    Q.   Okay.   You already answered it you said it was defendant

4    Bills that made that correction?

5    A.   I'm 99% positive because we reviewed every -- he reviewed

6    everything before I would send it out just for that reason

7    right there.

8    Q.   So he always corroborated with each other during this?

9    A.   There's no corroboration --

10          **MR. BENITEZ:**  Objection, argumentative --

11          **THE COURT:** Sustained.   That will be stricken.

12          **THE WITNESS:** Simple error --

13          **THE COURT:** No, there was no question, that will be

14    stricken as well.

15   **BY MR. LIVINGSTON:**

16   Q.   How can you be sure when that letter was received, July 26

17   letter -- this letter?

18   A.   Because we --

19          **THE COURT:** "This letter" you're referring to

20   Plaintiff's Exhibit 4?

21          **MR. LIVINGSTON:**   Yes.

22          **THE COURT:** The envelope, thank you.

23          **THE WITNESS:** It's date stamped on the back when it

24   was received in our office.

25   **BY MR. LIVINGSTON:**

1  Q.   That's also the date I received it?

2  A.   Correct.

3  Q.   So both dates whenever this stamp is?

4  A.   Whenever legal mail comes in, the very first day it comes

10:53:41AM 5  into the facility, it is date stamped.

6  Q.   So that means I received it that day also?

7  A.   We would have received it in the morning, you obviously

8  received it in the afternoon.

9  Q.   How can you be sure about the time when I received it?

10:54:07AM 10  A.   Because the officer comes and picks up the mail, like I

11  said, between 2:00 and 3 o'clock in the afternoon.  That would

12  mean that it would have to get over -- my portion of it's done

13  by 3 o'clock.

14       So that would mean it would have been in --

10:54:33AM 15  whatever time they delivered your mail, the officer delivers

16  your mail to your block some time after the morning.

17  Q.   Okay. Does that mean that the letter stamped on July 26th,

18  2006, but was not received by me on that date, because I was

19  out to court, that I received that letter on August 15th,

10:55:02AM 20  2006, had only the July 26th stamp on the envelope?

21           **MR. BENITEZ:**  Objection.

22           **THE COURT:** Sustained, I don't even understand what

23  it --

24           **THE WITNESS:** I'm confused.

10:55:19AM 25           **THE COURT:** You don't have to answer it because it's

1  too confusing.

2          **MR. LIVINGSTON:**  I'm going to show you what I mean

3  now.

4  **BY MR. LIVINGSTON:**

10:55:28AM 5  Q.   You see this letter right here that I was supposed to get

6  in 2006?  That letter right there that says live hold and I'm

7  speaking of?

8  A.   What date is on that one?  Okay.

9  Q.   You see I was supposed to have received that letter right

10:55:52AM10  there on that date, right?

11  A.   Sir, you could receive many more letters from the same

12  entity.  I cannot state that that is the same exact letter.  I

13  can say that, you know, it's from the same entity.  But I

14  cannot say that it is the same exact letter.

10:56:23AM15  Q.   I don't know what you was talking about just now, but --

16  A.   Same entity, same place.  Same -- same -- same department.

17  Q.   No, I'm talking about -- you see on this date, right?

18  A.   7/26.

19  Q.   That's the question that I didn't express it right to you,

10:56:48AM20  confused me, too, but this letter right here from Clerk, U.S.

21  District Court, Syracuse, and then the remark I guess the

22  officer wrote it, it says live hold, and the OTC where my

23  signature is supposed to be.  That means I didn't receive that

24  letter, right?

10:57:13AM25  A.   To the best of my knowledge.

1  Q.   Okay. It wasn't until that date right there, August 15,

2  '06?

3  A.   Lift it up.

4  Q.   This way?

10:57:37AM 5  A.   Yeah.

6  Q.   You see the date?

7  A.   August 15th.

8  Q.   Right.  And you see the entry by my name, the last one at

9  the bottom?

10:57:54AM 10  A.   Move it over, please.

11  Q.   Which way, this way?

12  A.   No, the other way.  I can't see your name or the entry.  I

13  see your name, okay.  And I can see the -- where it says the

14  court and then your cell number, but I can't see anything past

10:58:10AM 15  that.

16  Q.   Now, I signed for it?

17  A.   And you signed for it, yes.

18  Q.   So these two -- these two entries is like this one, this

19  one on July 26th?

10:58:23AM 20          THE COURT: What's the exhibit number you're

21  referring to?

22          MR. LIVINGSTON:  10.

23          THE COURT: Okay.

24  BY MR. LIVINGSTON:

10:58:28AM 25  Q.   I'm using page 1 and page 3.

1          On July 26th, '06, this letter arrived in this

2    facility -- in Elmira Correctional Facility, right?

3    A.   It may not have been the same letter, but it could have

4    been from the same entity.

10:58:55AM 5    Q.   You didn't understand my question.   The next time that

6    this entity appeared in the acknowledgment of receipt, it was

7    on August 15?

8    A.   Correct.   It could have been from the same place, but not

9    the same content.   With legal mail, I am not allowed to open

10:59:30AM 10   legal mail.   What came in one envelope which may have looked

11   like the other envelope could have contained two completely

12   different letters to you.

13          THE COURT: Let me ask you for him.   The letter of

14   July 26th --

10:59:47AM 15          THE WITNESS: Correct.

16          THE COURT: -- was sent back to your office because

17   he was out to court, correct?

18          THE WITNESS: Right.

19          THE COURT: When was that delivered?

10:59:52AM 20          THE WITNESS: I don't know.

21          MR. LIVINGSTON:   All right.   Thank you, sir.

22   BY MR. LIVINGSTON:

23   Q.   So this letter right here on the July -- the July 26th

24   letter that's on this July 26th, the first page,

11:00:19AM 25   acknowledgment of receipt, since I didn't receive it because I

1  was out to court, where would that letter went?

2  A.   It would have been put in the out to court file that we

3  needed while -- what we had been doing was checking it weekly

4  because we had staffing issues, and then it was later changed

11:00:48AM 5  that we had to check it daily.

6  Q.   So when I received the other letters, it should have

7  been -- this letter that I didn't receive should have been in

8  that holding bin too?

9  A.   It should have been in the out to court live hold to redo

11:01:18AM 10  for the next day, yes.

11  Q.   So then the next time, excuse me.

12       After you realize that I was -- I returned to the

13  court, then I supposed to got that letter the same -- the next

14  time I received legal mail, right?

11:01:43AM 15  A.   I would say yes.

16  Q.   Okay. So on August 8th, I mean, August 11, excuse me, '06,

17  when the next time that I received legal letters that -- that

18  letter wasn't on the receipt, the acknowledgment of receipt,

19  receipt form?

11:02:22AM 20  A.   I didn't handle that piece of mail.  I don't know what

21  happened.

22       **THE COURT:** That's not the question.  The question

23  is, the mail received on the 11th is from where?

24       **MR. LIVINGSTON:**  On the 11th is from --

11:02:35AM 25       **THE COURT:** No, not you.  You don't answer the

questions.  Can you see it?  Can you pull that up a little

bit?

          **THE WITNESS:** All right, let's see -- that one says

New York State Attorney General.

11:02:50AM          **THE COURT:** Thank you.

          **MR. LIVINGSTON:**  All right.

**BY MR. LIVINGSTON:**

Q.   So how come the letter that I didn't receive on July 26th

because I was out to court wasn't in that batch right here the

11:03:12AM next time I received legal mail, signed for it?

A.   I don't -- I don't recall.  I don't recall what happened.

Q.   Do you see the last sentence of your memo?

A.   If inmate Livingston was aware that legal mail should be

coming to him, he should have made inquiry.

11:04:23AM Q.   So that means that it was my fault?

          **MR. BENITEZ:**  Objection, argumentative.

          **THE COURT:** No, overruled.  You can answer that.

Was it his burden in other words?

          **THE WITNESS:** No, it's not his burden.  But we do

11:04:46AM the best we can to get it to them in a timely manner.  If he

was expecting something -- other inmates have called and

asked -- not called, have written and asked if we had anything

being with -- withheld in the out to court file.

**BY MR. LIVINGSTON:**

11:05:13AM Q.   How was I supposed to know if I was supposed to get legal

1  mail?

2  A.   If you had --

3          **MR. BENITEZ:**  Objection.

4          **THE COURT:** Sustained.

11:05:31AM 5  **BY MR. LIVINGSTON:**

6  Q.  Were you switching blame from you to me when you wrote

7  this?

8          **MR. BENITEZ:**  Objection, argumentative.

9          **THE COURT:** Sustained.

11:05:43AM 10          **MR. BENITEZ:**  Asked and answered.

11  **BY MR. LIVINGSTON:**

12  Q.  Are you the one that caused this denial of access to the

13  court?

14          **MR. BENITEZ:**  Objection.

11:05:57AM 15          **THE COURT:** Overruled.  You can answer that.

16          **THE WITNESS:** What was the question?

17  **BY MR. LIVINGSTON:**

18  Q.  Are you the one that caused the denial of access to the

19  court by not giving me this letter in a timely fashion?

11:06:11AM 20  A.   No, I had no --

21          **MR. BENITEZ:**  Objection.

22          **THE WITNESS:** I had no --

23          **THE COURT:** Overruled.

24          **THE WITNESS:** No -- I have no reason to hold your

11:06:25AM 25  mail for any reason.

**BY MR. LIVINGSTON:**

Q.   Nobody told you to hold it?

A.   It was held if it was -- if it was held, it was held
because at one point you were out to court.  But to
deliberately hold -- withhold your mail from you, no, we did
not do that.

Q.   We?  What you mean by we?

A.   We, me and the staff that worked in my office.

Q.   Did you read what defendant Bills wrote in his
investigation report?

A.   No, I have not.

Q.   You and him basically wrote the same thing.

          **THE COURT:**  It's not in evidence.

          **MR. LIVINGSTON:**  It's not in evidence, okay.  I
have to offer it first?

          **THE COURT:**  You have to offer it.  I don't believe
you can offer it through this witness.  It's not her memo,
right?  Did you mark 9B?

          **THE CLERK:** Did not.

          **THE COURT:** Mark that.

          **MR. LIVINGSTON:**  Thought you did.

          **THE CLERK:** Plaintiff's Exhibit 9B.

          **MR. LIVINGSTON:**  Sorry.

          **THE CLERK:** Mm-hmm.

          **THE COURT:** If it's not received you can't show it

1  to anybody.

2         **MR. LIVINGSTON:** I'll get this down.

3         **THE WITNESS:** No, I did not -- I did not see this.

4         **MR. LIVINGSTON:** Can I put this in evidence?

11:08:53AM 5         **THE COURT:** Not through this witness.

6         **MR. LIVINGSTON:** No, okay.

7         I can show it to her, though?

8         **THE COURT:** You just did. You can't show it to her,

9  they're -- it's not in evidence.

11:09:02AM 10 **BY MR. LIVINGSTON:**

11 Q.  All right. Part of your response and his response is

12 similar, so did he see yours? Did he see yours?

13 A.  Of course he saw mine. He's my supervisor. He corrected

14 my was for were.

11:09:23AM 15 Q.  And all the letters that was held from me while I was out

16 to court, was held in the same bin or same file?

17         **MR. BENITEZ:** Objection, assumes facts not --

18         **THE COURT:** She indicated -- well, I'll sustain the

19 objection to the form of the question.

11:10:14AM 20 **BY MR. LIVINGSTON:**

21 Q.  Do you know how many letters was mailed to me or held for

22 me while I was out to court?

23 A.  I have no recollection.

24 Q.  Would all the letters be held in the same area file?

11:10:33AM 25 A.  They would be all held in the out to court file.

Q.   So that's why -- so why didn't I get the first letter when
the other ones was delivered if they was all together?

MR. BENITEZ:  Objection, asked and answered.

THE COURT: Overruled.  You can answer that.

THE WITNESS: If it -- if we got it that day, the
date that's stamped on the back is the date that -- the only
thing I can keep referring to is the date that was on the back
is the date we received it in.

BY MR. LIVINGSTON:

Q.   Yeah.  About that, automatically when the legal mail
coming is something or some person just push it through the
stamp automatically?

A.   No.  We have to hand stamp on the back when we received
it.

Q.   All right.  So if somebody don't even want to stamp that
letter, they don't have to stamp that letter; is that correct?

MR. BENITEZ:  Objection, calls for speculation.

THE COURT: Yeah, sustained.

BY MR. LIVINGSTON:

Q.   Is it mandatory that a letter gets stamped?

A.   Yes, it is -- it is in the directive that it should get
stamped.

Q.   But a minute ago you said the directive is different or
something like that, you don't follow it or --

MR. BENITEZ:  Objection.

1          **THE WITNESS:** It's been updated.

2          **MR. BENITEZ:** Objection, form.

3          **THE COURT:** Sustained.

4    BY MR. LIVINGSTON:

11:12:45AM 5    Q.    In your report, Exhibit 9A, you didn't deny that the

6    letter was held while I was out to court?

7    A.    I'm not going to deny something if you were out to court

8    and it was held.

9    Q.    You didn't deny my allegations in the grievance either?

11:13:18AM 10          **MR. BENITEZ:** Objection.

11          **THE COURT:** Sustained.

12          **MR. LIVINGSTON:** Can I have a second, sir?

13          **THE COURT:** That's it?

14          **MR. LIVINGSTON:** No, I want to look at something.

11:14:07AM 15          **THE COURT:** Question, quickly, please.

16          **MR. LIVINGSTON:** All right. I would like to mark

17   Exhibit 16.

18          **THE CLERK:** Plaintiff's Exhibit No. 16.

19          **THE COURT:** All right, if you're going to go through

11:14:54AM 20   that we're going to take a break. Ladies and gentlemen, at

21   this time we're going to take a brief recess, approximately 15

22   minutes.

23          In the meantime, I'd ask you not to discuss the

24   matter or allow anybody to discuss the matter with you. The

11:15:02AM 25   jury may step down. We'll stand in recess for 15 minutes.

1                    (**WHEREUPON**, the jury was excused.)

2           **THE COURT:** As I indicated yesterday, we're going to

3    recess at noon today.  You've got to pick up the pace a little

4    bit here, okay?  Stand in recess.

11:15:53AM 5          **MR. LIVINGSTON:**  I'm trying.

6                    (**WHEREUPON**, there was a pause in the proceeding.)

7           **THE COURT:** Bring the jury out.

8                    (**WHEREUPON**, the jury is present).

9           **THE COURT:**  You may proceed.

11:32:48AM10         **MR. LIVINGSTON:**  Thank you, sir.

11          **MR. BENITEZ:**  Judge, may I approach the bench with

12   this document?

13          **THE COURT:** Sure.

14                   (**WHEREUPON**, a discussion was held at side bar out

11:33:38AM15  of the hearing of the jury.)

16          **MR. BENITEZ:**  I have no objection to that document,

17   but he wrote stuff on there and highlighted it and stuff.  I

18   have a clean copy --

19          **THE COURT:** Do you have a clean copy?

11:33:50AM20         **MR. BENITEZ:**  Not --

21          **MR. LIVINGSTON:**  I sent it in the mail the clean --

22   I think you passed it, that's it.

23          **THE COURT:**  This is it?

24          **MR. LIVINGSTON:**  Mm-hmm, that's the first page.

11:35:00AM25         **THE COURT:** Hang on.  This is different.

1          **MR. LIVINGSTON:**  That's the first page --

2          **THE COURT:** Oh, is it?

3          **MR. LIVINGSTON:**  Yeah, that's the first page.

4          **THE COURT:** Should be nine pages, right?  Nine

11:36:01AM 5 pages.  So I'll mark these.

6          **MR. BENITEZ:**  That's fine.

7          (**WHEREUPON**, side bar discussion concluded.)

8          **MR. LIVINGSTON:**  Just show, Your Honor, just show

9    the unmarked ones?

11:36:43AM 10         **THE COURT:**  Any objection to 16?

11         **MR. BENITEZ:**  No objection, Your Honor.

12         **THE COURT:** 16 will be received.  Let the court

13   reporter mark it or the court deputy mark it.

14         (**WHEREUPON**, Plaintiff Exhibit 16 was received into

11:36:55AM 15 evidence).

16         **THE COURT:** Is there a question?

17   **BY MR. LIVINGSTON:**

18   Q.   You know that policy and procedure right there?

19   A.   Can I take a minute to read it through, please?

11:37:50AM 20         **THE COURT:** Sure.

21   **BY MR. LIVINGSTON:**

22   Q.   Thanks.  Are you familiar with this?

23   A.   Yes, sir, I am.

24   Q.   So you had to go by this policy and procedure at Elmira?

11:40:02AM 25 A.   Yes, sir.

1  Q.   It's not on the computer, is it?

2  A.   I cannot state for sure, but a lot of the directives are

3  now.

4  Q.   When you read it -- when you read it was it on a computer

11:40:18AM 5  or you read it as this?

6  A.   I read it as a hard copy.

7  Q.   Only directives for the State is on the computer?

8  A.   Excuse me?

9  Q.   Only the directives like directive 4015, is that the only

11:40:39AM 10  one?

11  A.   No, a lot of the things are, but I'm not -- with now being

12  in the payroll office, I am not familiar with all the ones

13  that are in there -- on the shared drive for other areas, but

14  for the one I'm working in now.

11:41:01AM 15  Q.   So you have to follow these policies and procedures

16  written here?

17  A.   To the best of our ability.

18  Q.   What will stop you from following these procedures?

19           **MR. BENITEZ:**  Objection, Your Honor.

11:41:14AM 20           **THE COURT:** Sustained.

21  **BY MR. LIVINGSTON:**

22  Q.   This policies, they don't override directive, DOCS

23  directive, do they?

24           **MR. BENITEZ:**  Objection, she's not qualified --

11:41:31AM 25           **THE COURT:** Sustained.

1          **MR. LIVINGSTON:**  If she could read it -- she read

2  it just now, it says it.

3          **THE COURT:** I sustained the objection to the last

4  question.

11:41:39AM 5  **BY MR. LIVINGSTON:**

6  Q.   You see that paragraph F?

7  A.   I do.

8          **THE COURT:** This is a page from Exhibit 16, or

9  Exhibit --

11:42:20AM 10          **MR. LIVINGSTON:**  16.

11          **THE COURT:** 16, thank you.

12  **BY MR. LIVINGSTON:**

13  Q.   You see the second paragraph under paragraph F?

14  A.   I do.

11:42:37AM 15  Q.   Can you read that?

16  A.   I do.

17  Q.   Can you read it?

18          **MR. BENITEZ:**  Objection, Judge.

19          **THE COURT:** It's in evidence.  Anybody --

11:42:47AM 20          **MR. BENITEZ:**  It's in evidence, it speaks for

21  itself.

22          **THE COURT:**  -- anybody can read it, it's in

23  evidence.  Go ahead.

24          **THE WITNESS:** The correspondence staff assumes the

11:42:54AM 25  responsibility for completing the procedures referred to in

1  Section C of Department Directive 4015.

2  Q.   What do that mean to you?

3  A.   That the Department is to comply with 4015 to the best of

4  their -- to the best of their ability.

11:43:25AM 5  Q.   Okay. Thank you.

6          **MR. LIVINGSTON:**  I have no further questions.

7          **THE COURT:** Thank you.

8          Mr. Benitez.

9          **MR. BENITEZ:**  Judge, two questions.

11:43:31AM 10          <u>**RECROSS-EXAMINATION**</u>

11  **BY MR. BENITEZ:**

12  Q.   Now, you were questioned on examination by the plaintiff

13  about a letter being on live hold.  Do you remember your

14  testimony on that?

11:43:58AM 15  A.   I do.

16  Q.   Okay. And do you remember that that particular live hold

17  related to a different public entity than the New York State

18  Court of Appeals?

19  A.   I would say no.

11:44:28AM 20          **THE COURT:** What exhibit is that?

21          **MR. BENITEZ:**  This is Plaintiff's Exhibit No. 10.

22          **THE COURT:** Thank you.

23          **THE WITNESS:** Okay.  That's --

24  **BY MR. BENITEZ:**

11:44:37AM 25  Q.   Okay.  From this exhibit here, do you remember testifying

1  about this live hold?

2  A.   Yes.

3  Q.   Okay. And this live hold related to what public entity?

4  A.   The Clerk of the U.S. District Court in Syracuse -- looks

11:44:54AM 5  like Syracuse.

6  Q.   Now, looking at Exhibit -- Plaintiff's Exhibit No. 4 --

7  A.   That's Court of Appeals Clerk's Office, Albany, New York.

8  Q.   Okay. What does that tell you when you look at those two

9  different documents?

11:45:16AM 10  A.   It's two different entities.

11  Q.   Okay. So based upon the documents that had been presented

12  to you today, and based upon your knowledge and experience,

13  Plaintiff's Exhibit No. 4, the envelope from the Court of

14  Appeals, was that ever on hold?

11:45:49AM 15  A.   Not to my knowledge.

16  Q.   Ms. Gates, have you ever testified as a witness in the

17  federal court?

18  A.   No.

19  Q.   And are you a bit nervous today?

11:46:18AM 20  A.   Yeah.

21       **MR. BENITEZ:**  Thank you, nothing further.

22       **THE COURT:** Anything further?

23       **MR. LIVINGSTON:**  One.

24

11:46:25AM 25

## REDIRECT EXAMINATION

**BY MR. LIVINGSTON:**

Q.   If this wasn't on hold why would somebody put OTC on it?

      **THE COURT:** Referring to 4 -- Exhibit 4?

      **MR. LIVINGSTON:**  Yes.

      **THE COURT:** Thank you.

      **THE WITNESS:** As I have said before, the OTC could have been put there by the delivering officer.

**BY MR. LIVINGSTON:**

Q.   But the delivering officer would put it on Exhibit -- Exhibit 10?

A.   He could have done -- he could have done both.

Q.   But normally, like it was done on Exhibit 10, the first page he would put it on this exhibit?

A.   As I said, depending upon the officer, he could have put it on both or his supervisor could have put the comment in inmate signature.

Q.   So why he didn't put it on page 4 of that Exhibit 10?

      **MR. BENITEZ:**  Objection, she's not qualified to speak for somebody else.

      **THE COURT:** Sustained.

      **MR. LIVINGSTON:**  That's it, Your Honor.

      **THE COURT:** Anything further?

      **MR. BENITEZ:**  Nothing further.

      **THE COURT:** I have a couple questions just to

1  clarify some questions.

2          **THE WITNESS:** Sure.

3          **THE COURT:** Legal mail, how do you determine what is

4  legal mail?

11:47:51AM 5          **THE WITNESS:** We determine legal mail by looking at

6  the return address and we have, of course, there's the known

7  entities, but if there is like lawyers, whatever, we check --

8  we have a -- we had a set of books with all the legal

9  entities, lawyers' names in it and we could look it up through

11:48:18AM 10  that.

11          **THE COURT:** Okay. Secondly, if mail's held because

12  one is out to court, it's held in a particular location, where

13  is that?

14          **THE WITNESS:** It's in the correspondence office in

11:48:33AM 15  a -- in a file drawer that's marked out to court.

16          **THE COURT:** Okay. And you indicate that that was

17  checked on a weekly basis at one point?

18          **THE WITNESS:** At one point.

19          **THE COURT:** And that was changed?

11:48:44AM 20          **THE WITNESS:** Yes.

21          **THE COURT:** Okay. Was the computer utilized to

22  determine if somebody was out to court or returned from court?

23          **THE WITNESS:** The only thing it would say would

24  be -- it would say live hold if they were on their way back,

11:49:10AM 25  or to; and if they were being held at another facility, it

1 would show where we -- normal housing, normal housing, where

2 they were; and up here it would say what facility that they

3 were being temporarily held at to go; and if it showed a

4 different agency, it was basically because they were out to

11:49:42AM 5 court.

6        **THE COURT:** Okay.

7        **THE WITNESS:** Not necessarily, you know, or like we

8 have a hospital within the system, we have a mental health

9 within the system, so they could be held at any one -- any one

11:50:01AM 10 of those entities, but it would show where his physical body

11 was at the time.

12        **THE COURT:** Okay.  Thank you very much.  You may

13 step down, thank you.

14        (**WHEREUPON**, the witness was excused).

11:50:12AM 15        **THE COURT:** Call your next witness.  We'll at least

16 get started.  We're going to break at noon, but call your next

17 witness.

18        **MR. LIVINGSTON:**  Okay, defendant Bills.

19        **PLAINTIFF'S WITNESS, WILLIAM BILLS, SWORN**

11:50:27AM 20                **DIRECT EXAMINATION**

21        **THE CLERK:** State your name and spell it for the

22 record.

23        **THE WITNESS:** William R. Bills, W-I-L-L-I-A-M, R,

24 B-I-L-L-S.

11:50:53AM 25        **THE CLERK:** Thank you.

**BY MR. LIVINGSTON:**

Q.   Good morning.

A.   Good morning.

Q.   Do you remember answering interrogatories?

11:51:16AM A.   Yes, I do.

Q.   What exactly is your function in Elmira Correctional?

A.   Well, actually I no longer work at Elmira Correctional Facility, I work at Five Points Correctional Facility, but at the date in question I was a supervising correction counselor, 11:51:49AM which meant that I -- one of my ancillary functions was to oversee the mail room, which basically meant that I was in charge of doing yearly evaluations on Ms. Gates.

When there were situations with staffing in the mail room, I was charged with the responsibility of making 11:52:16AM sure that there was proper coverage or adequate coverage within the -- to keep the mail room functioning properly, any purchasing in the mail room environment would be run from Renee to me up through the chain of command.

When there were grievances such as yours, normally 11:52:42AM the grievance would be filed in the grievance office, it would be forwarded to the deputy superintendent for programs who was my boss, then it would be sent down to me because it was my area of responsibility.

I would take that grievance and I would forward 11:52:58AM that to the mail room.  In this case, they would give me

1  whatever documentation they had on the issue, then it would be

2  brought back through the chain, I would look at it, I would

3  come up with a response, based on the documentation, and then

4  I would forward it to the deputy superintendent of programs,

11:53:17AM 5  who would do the same, and then it would be returned to the

6  grievance office so that the grieving inmate could have a

7  hearing in the grievance process.

8  Q.   So she didn't have assistance at that time, like assistant

9  deputy superintendent?

11:53:35AM 10        THE COURT: You're talking about "she," who are you

11  referring to?

12        MR. LIVINGSTON:  Defendant Whitten, that's his

13  supervisor.

14        THE WITNESS: There may have been a deputy

11:53:44AM 15  superintendent at that time.  The deputy superintendent -- I'm

16  not sure if deputy superintendent at the time was Mr. Kron

17  then, I don't know if it was the responsibility of his at that

18  time, I don't know the answer to that.

19  BY MR. LIVINGSTON:

11:54:01AM 20  Q.   Would defendant Whitten have assistant deputy

21  superintendent of programs at that time?

22  A.   There would be an assistant deputy superintendent of

23  programs, but he would have -- he would have responsibilities

24  assigned by the superintendent and by the deputy

11:54:22AM 25  superintendent of programs.

1        I believe that the assistant deputy superintendent

2   at Elmira was actually primarily in charge of the reception

3   center, which is a separate facility within the Elmira

4   Correctional Facility that deals with incoming inmates from

11:54:38AM 5   the county system, any county inmate who was convicted and

6   committed to New York State custody would come through the

7   reception center.

8        Elmira reception center actually covers the whole

9   center of the state west.  I think it's 33 or 34 correctional

11:54:58AM 10  facilities, but I know that at that time the assistant deputy

11  superintendent's primary responsibility was the reception

12  center.

13  Q.   So this wouldn't have went to -- in front of him then?

14  A.   I don't know if it did or it didn't.  None of the

11:55:11AM 15  documentation that I see has his name on it, so I have to

16  believe that it didn't.

17  Q.   Are you familiar with Elmira inmate correspondence program

18  policies and procedure 15.02?

19  A.   I would say that any time that there was a grievance, any

11:55:37AM 20  time there was a complaint and I had to do any investigating,

21  that I probably looked at every directive that related to the

22  correspondence office if that's where I need to get an answer.

23        **MR. LIVINGSTON:** I give him Exhibit 16.

24  **BY MR. LIVINGSTON:**

11:56:01AM 25  A.   Anything in particular you want me to look at?

1  Q.   Are you familiar with that document?

2  A.   Yes, this would be the Elmira Correctional Facility policy

3  and procedure.

4  Q.   That's what Elmira correspondence office go by, too?

11:56:21AM 5  A.   This is a guideline for -- this is a guideline for what

6  the staff and the correspondence area go by.  Directives are

7  actually the same thing, directives are guidelines for

8  operation of every area of the facility.

9  Q.   That one specifically is just for the correspondence

11:56:44AM 10  program though?

11  A.   That's correct.

12  Q.   You see I think it's IV, subdivision A, paragraph 1?

13  A.   Yes, do you want me to read it?

14  Q.   Yes, if you don't mind.

11:57:13AM 15  A.   Correspondence staff will perform their duties in the

16  correspondence office, staff are available Monday through

17  Friday, excluding holidays, from 8 a.m. to 4 p.m. and are

18  under the supervision of reception center senior correction

19  counselor.

11:57:27AM 20  Q.   That would be you?

21  A.   That would be me at the time, yes.

22  Q.   Does that paragraph make you liable for wrongs and

23  violations that occur in that mail room?

24          **MR. BENITEZ:**  Objection.

11:57:42AM 25          **THE COURT:** Sustained.

**BY MR. LIVINGSTON:**

Q.   How would you interpret that paragraph?

A.   Well, exactly as I described before.  My supervision of the reception center or the -- of the mail room correspondence office was, you know, from a level above where I was overseeing the operation.

I did not handle a piece of mail.  I didn't -- I didn't receive a single piece of mail.  I didn't take a piece of mail and run it through a mail machine.  I did not do cell location mail.  I didn't inspect incoming inmate mail.

Merely an oversight position.  It was my job if there was a problem, as you brought to our attention, for me to investigate it and come up with a response and if something needed to be adjusted, we would make an adjustment.

Q.   Oh, so you made adjustment when I -- after I filed that grievance?

A.   Well, yes.  As part of that investigation, and as I recall, just for clarity, and I don't have it in front of me right now, but my recollection of that grievance was that it was not specific to a single piece of mail.  If I remember correctly, the grievance said something about legal mail, pieces of legal mail not getting to you in a timely fashion.

And I don't believe that the grievance said anything about any particular piece of mail, any court that the mail came out of, and I think what you've already

1  demonstrated through looking at, I believe it's Exhibit 10,

2  legal log sheet, or the acknowledgment of receipt form, I

3  think what you've already exhibited is that the piece of mail

4  that was received on 7/26 was held because you were out to

11:59:38AM 5  court until 8/2.

6  And I think what you have demonstrated, my opinion,

7  what you've demonstrated that piece of mail did, in fact, have

8  a delayed delivery to you.  But we don't have that -- we don't

9  have that envelope here so I don't know anything about that

11:59:58AM 10  envelope.

11  Q.   This already is in evidence?

12  **THE COURT:**  Referring to Exhibit 4.

13  **THE WITNESS:**  That's not the envelope.  That's not

14  the envelope from the -- from the 7/26.  That envelope is from

12:00:17PM 15  the 8/17 receipt.

16  **BY MR. LIVINGSTON:**

17  Q.   But this is what this claim is about right here.

18  A.   I understand that, but that's not the piece of mail that

19  came in on the 26th of the month.  That piece of mail did not

12:00:32PM 20  come in on the 26th of the month, it came in on the 17th of

21  August.

22  Q.   So you saying that mail takes 22 days to get to you

23  facility?

24  A.   I'm not saying that at all.  If you -- I don't know what

12:00:45PM 25  kind of -- I don't know what point you're making here, but if

1  you look at the Pitney Bowes stamp on the right corner of

2  this, the only thing that Pitney Bowes says is that on that

3  date, 7/26, it was ran through the Pitney Bowes machine at the

4  Albany courthouse.  It doesn't say anything about when it was

12:01:04PM 5  actually sent.  We have no knowledge of when that piece of

6  mail was actually sent to the U.S. Postal Service.

7  Q.   So that July 26th date is incorrect in your opinion?

8  A.   No, what that means is that that piece of mail was ran

9  through the Pitney Bowes machine at the Albany courthouse on

12:01:24PM 10  that date.  But it doesn't tell us when the Albany courthouse

11  staff took that piece of mail and put it in the U.S. Postal

12  Service.

13  Q.   Right.  So --

14  A.   One thing is for sure, it didn't get delivered to Elmira

12:01:38PM 15  on the 26th of July.

16  Q.   That's the dispute right there.

17          **THE COURT:** That will be stricken.  You can't make

18  comments.  And we're going to take a recess at this time

19  because I have to be somewhere.  Ladies and gentlemen, at this

12:01:49PM 20  time we're going to be in recess until 8:30 tomorrow morning.

21  I'd ask you not to discuss the matter or allow anybody to

22  discuss the matter with you.  We'll stand in recess until 8:30

23  tomorrow morning.

24          The jury may step down.

12:02:03PM 25          (**WHEREUPON**, the jury was excused).

1          **THE COURT:** Anything before we recess?

2          **MR. BENITEZ:** Nothing, Judge.

3          **THE COURT:** Thank you.

4          **MR. LIVINGSTON:** Your Honor, he's leaving. I want

12:02:50PM 5   to ask you one thing. Those exhibits, they going to be ready

6   for, you know, because in your letter you said that there's

7   three of them. I sent the jury exhibit and he got his

8   supposedly.

9          **THE COURT:** I'm not sure what you're talking about.

12:03:10PM 10         **MR. LIVINGSTON:** The exhibits. They going to be

11   ready for like the jury and stuff like that?

12          **THE COURT:** The exhibits?

13          **MR. LIVINGSTON:** Yeah. That I sent, yes.

14          **THE COURT:** Well, you have them all, you have them

12:03:23PM 15   all, don't you?

16          **MR. LIVINGSTON:** I got mine, but the ones I sent to

17   the Court --

18          **THE COURT:** They're just copies for the Court?

19          **MR. LIVINGSTON:** Oh, this is for the Court? It's

12:03:29PM 20   not for the jury too?

21          **THE COURT:** No, the ones that will go to the jury

22   are those received in evidence, that's what they'll get

23   eventually. Okay?

24          **MR. LIVINGSTON:** Okay, thanks.

12:03:38PM 25          **THE COURT:** Thank you.

1       (**WHEREUPON**, the proceedings adjourned at 12:03 p.m.)

2                       *     *     *

3                   CERTIFICATE OF REPORTER

4

5       In accordance with 28, U.S.C., 753(b), I certify that

6  these original notes are a true and correct record of

7  proceedings in the United States District Court for the

8  Western District of New York before the Honorable Frank P.

9  Geraci, Jr. on October 22nd, 2013.

10

11  S/ Christi A. Macri

12  Christi A. Macri, FAPR-RMR-CRR-CRI
    Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25